# CHARLESTON.

## ROBINSON v. BRAIDEN et al.

Submitted June 11, 1897—Decided December 1, 1897.

1. REFORMATION OF DEED—*Metes and Bounds—False Description.*
B., by his agent, H., without contract in writing, sold to O. a certain tract of land of one thousand acres, part of the Braiden tract, of five thousand acres, and the sale was not consummated until the land was conveyed; and, before it was sold and conveyed by the one act, it had been surveyed and run off and located on the ground by definite metes and bounds, but one of the lines of definite and fixed location was called the division line by the mistake of the agent, who was ignorant of the true location ᴼf such division line. *Held*, it is not such a mistake as would justify a reformation of the deed so as to extend the land conveyed up to, and then with, said division line; that the land sold was the land as run off and surveyed, which satisfies the calls of the deed, and the calling of one of the lines the division line was a false description which creates no uncertainty and works no injury. (p. 189).

2. REFORMATION OF DEED—*Mistake—Purchaser for Value.*
To reform a deed on the ground of mistake, the mistake must be mutual (that is, participated in by both parties), and must be made out, by clear and convincing proof, beyond reasonable controversy; and in no case will it be made to the injury of a *bona fide* purchaser for value without notice. (p. 190). .

3. EQUITY—*Defendant at Law—Confession of Judgment.*
A defendant at law, having a legal defense to the action, and a distinct ground for equitable relief against the plaintiff's claim, may bring his suit in equity without waiting for the determination of the action at law, and may, without being . compelled to waive his legal defense by confessing judgment, have a hearing in the court of equity on the merits of his case, and a decree for the proper relief. (p. 195).

4. CONFESSION OF JUDGMENT—*Equity.*

  If it was proper to require a confession of judgment, it should expressly provide that the judgment so confessed was thereafter to be dealt with as the court of equity might direct.     (p. 195).

5. EQUITY JURISDICTION.

  A court of equity, having properly taken jurisdiction for one purpose, may properly retain it for others that may be necessary to the final settlement of all matters involved in the litigation between the parties growing out of, and connected with, the subject-matter of the suit.     (p. 194).

6. . EQUITY JURISDICTION—*Setting aside Judgment.*

  If, after the chancery court has taken jurisdiction, and decided the controversy, on its merits, in favor of the defendant, the plaintiff then moves the court to set aside a judgment confessed, because of other defenses, such defenses must be made known to the court, that it may determine whether they are substantial, and not merely pretended; otherwise the judgment ought not to be set aside.     (p. 196).

Appeal from Circuit Court, Wetzel County.

Bill by L. G. Robinson against Edward Braiden and others to correct a deed, and to enjoin proceedings in ejectment.   From a decree against her, plaintiff appeals.

*Affirmed.*

HUTCHINSON & CAMDEN, MCELDOWNEY & WILEY and H. P. CAMDEN, for appellant. .

A. B. FLEMING, THOS. P. JACOBS and U. N. ARNETT, JR., for appellees.

DENT, JUDGE:

On appeal from a final decree entered by the circuit court of Wetzel county on the 28th day of May, 1895, dissolving the injunction to the prosecution of an action of ejectment, and dismissing her bill, and overruling plaintiff's motion to make an order setting aside a confession of judgment required and made by her in the action of ejectment as a condition precedent to granting said injunction. The appellant assigns the following five grounds of error: (1) The said decree is erroneous in dissolving the injunction granted in said cause.   (2) It was error to dissolve the injunction, because the evidence sustains the allegations of the bill.   (3) The evidence establishes that the

mistake alleged by plaintiff to have been made in the calls
of her deeds was in fact made, and it was therefore error
in the court to refuse to reform said deeds. (4) The
court erred in overruling the motion, in writing, made a
part of said decree, praying the court to set aside the
judgment confessed in the action of ejectment mentioned
in said decree, which judgment was confessed upon the
order of said court, made upon the law side thereof, as the
only condition upon which the court would entertain the
bill for injunction in said cause. (5) The court also erred
in overruling the motion of the plaintiff to reinstate said
action of ejectment on the law side of said court, for trial
therein the same as said action stood at the time said in-
junction was granted.

On the 23d day of March, 1889, the defendants in error
Charles E. Wells, John Blackshire, Newton S. Beatty,
Amos Prichard, and A. W. Prichard brought their action
of ejectment in the circuit court of Wetzel county against
plaintiff in error, L. G. Robinson, and others, to recover
the possession of a certain tract of land, situated on the
waters of Fishing creek and the waters of Middle Island
creek, in the county of Wetzel. On the 24th day of Sep-
tember, 1894, when the action of ejectment was about to be
called for trial, L. G. Robinson, plaintiff in error, and one
of the defendants in the action of ejectment, discovered,
as she says, that by an inconsistency and conflict in the
calls of her deed on which she relied for her defense, her
deed did not, when literally construed, embrace the land
intended to be thereby conveyed, and that there was a mis-
take in the calls of her deed, which she desired a court of
equity to correct before going into the trial of the action
of ejectment. So, accordingly, on the 24th day of Septem-
ber, 1894, she instituted this suit in equity to correct and
reform her deed, and to enjoin the plaintiffs in ejectment
from proceeding therein against her will to the determina-
tion of her chancery cause; but the court refused to grant
the injunction prayed for until and unless the plaintiff in
error confessed judgment in the action of ejectment,
which was accordingly done on the same day. The chan-
cery cause was then matured for hearing, and on the 28th
day of May, 1895, a final decree was entered, in which it

was considered by the court that the plaintiff was not en-
titled to the relief prayed for, and thereupon the injunc-
tion was dissolved and the bill dismissed. But, before the
decree was entered so as to become final, she moved the
court to set aside the judgment confessed in the action of
ejectment, and to cause to be reinstated on the common-
law docket the action of ejectment. But the court over-
ruled her motion, and, on motion of the plaintiffs in the ac-
tion of ejectment, gave them leave to sue out a writ of pos-
session for said premises.

The facts on which the points of law here involved mainly
turn are, for the most part, documentary. The common-
wealth of Virginia, by patent dated on May 25, 1797,
granted to Archibald Woods a tract of land calling to con-
tain six thousand acres (but afterwards found to con-
tain some ten thousand acres), situate then in Ohio county,
but now in the county of Wetzel. His brother, Robert
Woods, was the equitable owner of an undivided half; and
Robert having died, leaving a will, Archibald and the
executors of Robert on the 19th day of July, 1832, executed
an agreement and deed of partition on this tract, among
many others. One of the corners was a chestnut oak and
a white oak on the top of a ridge. This tract was to be
divided by a sight line beginning at this corner, and
running through the tract so as to so intersect the third
line from this corner as to divide it into two equal parts;
and the east half was thereby set apart and allotted to the
executors of Robert—being the only land with which this
suit has anything to do. About the year 1835, John Talk-
ington (a witness who still lives to testify) was employed
to run and mark this division line, which he caused to be
run, marking the line himself. Not being able to find the
chestnut oak and the white oak, he marked as the begin-
ning corner two poplars and a lyn outside of the Woods
survey; to the north, ran and marked a line S. 6¼ E., which
entered the Woods survey 32 poles to the west of the true
corner, the chestnut oak and the white oak, and ran on
that course until he struck the third line, thus cutting the
survey in two. This eastern end was thenceforth called
for as containing five thousand acres. By deed dated Feb-
ruary 15, 1852, Beverly M. Eoff and Alexander Q. Woods,

who had been appointed administrators *de bonis non*, with
the will annexed, of Robert Woods, deceased, sold and
conveyed said east end to Isaac Hoge and James Musgrave.
By deed dated 13th day of July, 1859, these administrators,
in order to correct an inaccuracy in the description and
boundary of the land in the first deed, executed a second
deed to these two grantees, by which they conveyed to
them said eastern half according to the Talkington divis-
ion line, which thenceforward appears to have been adopt-
ed by all interested as the true division line. By various
mesne conveyances, of no significance here, the title of
this eastern half of five thousand acres became vested in
P. D. Gambrill by deed dated December 13, 1864, running
with the Talkington line, elsewhere called the "6¼-deg.
line"; and by deed dated the 17th day of September, 1867,
Gambrill sold and conveyed the same to Edward Braiden,
describing it as being the same described by the deed of
Isaac Hoge and James Musgrave to him. It seems to be
known in this record as the "Braiden Tract," of five
thousand acres. And from Braiden as a common source,
the plaintiffs and defendants derive title to their respect-
ive parts. By deed dated the 19th day of June, 1875,
Braiden sold a part of the five thousand acre tract of one
thousand acres, known as "Lot No. 1," to John Orr; and
by deed dated June 24, 1875, he conveyed to John Orr an
adjoining parcel of one thousand acres, called the "John
Orr Lot No. 2." By deed dated the 25th day of Septem-
ber, 1875, Braiden sold and conveyed to Samuel Newber-
ger all the rest, residue, and unsold portion of said tract,
supposed to contain three thousand acres, more or less.
On the 1st day of June, 1876, Samuel Newberger conveyed
the said three thousand acres, being such unsold, *etc.*, to
D. H. Leonard, trustee; and Leonard, as such trustee, and
as special commissioner appointed by the circuit court,
conveyed the same to defendant Charles E. Wells by deed
dated 16th day of July, 1888; and by deed dated Septem-
ber 26, 1888, Charles E. Wells sold and conveyed three-
fourths thereof to his co-defendants. The action of eject-
ment was instituted on the 23d day of March, 1889,—not
for the John Orr lands, for they were excepted out of the
deed of trust to H. Leonard, as having been previously

sold and conveyed to John Orr.   By deed dated the 2d day of March, 1892, the widow and the children and heirs of John Orr, deceased, sold and conveyed to the plaintiff in this suit, Mrs. L. G. Robinson, the two tracts of one thousand acres each, which Braiden had conveyed to John Orr in June, 1875, with certain specified exceptions, which are significant as helping to fix the boundary of the two tracts, of one thousand acres each, along the 22-deg. line.

Now, we have at length reached the bone of contention between Mrs. Robinson, the plaintiff in the chancery suit and defendant in the action of ejectment, on the one side, and Charles E. Wells and others, plaintiffs in the action of ejectment and defendants in the suit in chancery, involving the ownership of a strip or gore of land, of some five hundred acres, we may say, for convenience of designation; for when W. V. Hoge, the agent acting for Braiden, caused to be run off, and sold to John Orr, the tract of one thousand acres, No. 1, he did not begin on the Talkington division line where it first crossed into the Woods survey, and run thence with that line S., 6¼ E., 77 poles, but ran it off as though he had begun at the original corner, the chestnut oak and white oak on the ridge, 32 poles west of the two poplars and lynn, the beginning corner of the Talkington line, and instead of running S., 6¼ E., ran S., 22 E., 760 poles, to where such line crossed Archie's Fork of Fishing creek, near Abraham Ice's field.   Thus stated, it makes plain the boundaries of the land in dispute between these two divergent lines, though, according to the deed, he ran around the other way, viz.: "Beginning at [said] white oak and chestnut oak on a ridge, a corner to a 5,000-acre tract belonging to said [Edward] Braiden; thence S., 70 E., 470 poles, to a stone; thence S., 18 W., 680 poles, to where line of 5,000-acre survey crosses Archie's Fork, near Abraham Ice's field; thence with said line N., 22 W., 770 poles, to the beginning, containing 1,000 acres." Lot No. 2, of one thousand acres, adjoining lot No. 1 on the west, was the line S., 18 W., 680 poles, as the common line.   Edward Braiden, the owner, had instructed W. V. Hoge, his agent, to so sell as to not make it fragmentary, but to keep the unsold part connectedly compact, as nearly as might be.   Agent Hoge knew that the back line of the

Braiden five thousand-acre tract was the John Talkington partition line between the Robert and Archie Woods partition lots; but its exact locality seems to have become obscure, and but little known among those of the present generation who were then upon the ground to see and to know. It had become in some degree a "lost line," to use a term found in the testimony of this cause. So that the surveyor, Frank Hoge, the brother of Hoge, the agent, very naturally took the chestnut oak and white oak standing on the ridge as the starting point of the Talkington line; for he found it fixed as such in the partition deed. How Agent Hoge came to take as a point on the Talkington line a place where a S., 22 E., course, would strike and cross Archie's Fork of Fishing creek near Abraham Ice's field, does not quite clearly appear. The old gentleman who ran the Talkington line some sixty years ago describes his work as follows : "We began at the head of a drain (it then had no name) on the west side of the fork, crossing Horse Run near its mouth. Slab camp ran a little above its mouth, and several branches on the west side of the main branch of Archie's Fork, running on and along east of where Isaac Ice at one time lived, and west of where Jesse F. Snodgrass now lives, and into the dividing line between the survey of 21,000 acres and the divided survey of 6,000 acres. Along this line the trees were small but I marked them high and well with a hunter's tomahawk." This line does not at any point cross Archie's Fork. Thomas Tucker, about the year 1858, it seems, ran this line, bearing the course S., 22 E,, reverse N., 22 W., blazing it fore and aft. This, no doubt, misled Mr. Hoge's brother, who ran off the John Orr lot, into taking it for the Talkington line; for it was, no doubt, pointed out to him as the division line. But, no matter how it come about, it is a plain instance of the common class of cases of one acting in ignorance of a fact which the courts under no circumstances undertake to remedy or redress, as contradistinguished from such mistake of facts as courts do undertake to give some remedy for or relief against. Such action of ignorance of a fact has not one element of relief that plaintiff needs to have, and the courts always exact; for the 22-deg. line was taken as the line to

run with and sell by, without any regard whatever to his knowledge or ignorance of where the division line was. Here nothing was left out of the deed by mistake that was sold or intended to be sold and put in; but something was left out, as unsold, which might have been included and conveyed if Mr. Hoge's brother, who did the surveying, had not been ignorant of the whereabouts of the John Talkington line. And the agent, Hoge, in his testimony, makes clear the fact that the sale and conveyance were all one,—made with one. and the same breath,—and that he did not intend to sell or cause to be conveyed to John Orr one inch of ground that was not then and there thus run off for him; nor did John Orr buy, or have any right to suppose he was buying, any part of the Braiden five thousand-acre tract, except exactly that part which his deed calls for; and yet it is equally true that Hoge's ignorance of the true location of the Talkington division line caused him to leave out of the part sold and conveyed to Orr a part or all of the strip which is here in controversy. So that we need spend no time in considering or discussing the doctrine of mistake of fact as ground of equitable relief; and that disposes of the "equity" of the case, leaving the question, what land does this deed, as signed, sealed, and delivered, include?

The legal effect of the instrument, to be gathered from the deed itself, properly read and construed, is a question for the court. See *State* v. *Emblem*, 44 W. Va., —, (29 S. E. 1031). But its application to its proper subject-matter, as found on the land, is the duty of the jury, under instructions to be received from the court. A written instrument speaks for itself, and it is the duty of the court to read it by the light of the surrounding circumstances, to be ascertained, if necessary, by a jury, and to construe it, as soon as the true meaning of the words are ascertained, and then instruct the jury as to its character, meaning, and legal effect. And it is the duty of the jury to take the construction from the court, either absolutely, if there be no words to be construed as words of art or phrases used in commerce, and no surrounding circumstances to be ascertained, or conditionally when those words or circumstances are necessarily referred to them (see *Neilson* v,

*Harford*, 8 Mees. & W. 806, 823; 2 Pars. Cont. bottom page 610, note N.), and thus informed by the court as to the law of the case, and by the testimony as to the facts, apply the instrument to its proper subject-matter on the ground,—eminently a question of legal construction for a law court to make, and for a jury to receive and apply. So that the legal question may remain, where does the deed, as made, take us,—to what western line? not that something that was in the contract of sale has by mutual mistake been left out. The bill, on its face, presented for relief this equity. In substance, the plaintiff alleged in her bill that in the deed of 19th June, 1875, made by Edward Braiden to John Orr, there was a mistake made in the course of a line, in that it called to run N., 22 W., 770 poles, to the beginning, whereas it should have run with the John Talkington division line, N., 6¼ W., 770 poles, to the beginning; that such mistake was mutual; that Edward Braiden and his agent, W. V. Hoge, meant to convey, and John Orr meant to buy up to and running with, that outside line of the Braiden five thousand-acre tract; and that defendants were not innocent purchasers for value, but had notice of such intention. But the voluminous evidence wholly fails to support or make out the equity alleged in the bill and denied in the answer. The one is called, for designation, the "N., 22 W., line," without reference to its exact bearing; and the other, the "Talkington division line," or the "N., 6¼ W., line," without reference to its exact bearing. Hoge, the seller, took the wrong thing for the true thing, by reson of his ignorance; but he took good care to make the wrong thing the right thing, *pro hæc vice.* Of this mistaking on his part he had foreclosed against complaint, for he had, as owner of the whole, the right to make the boundaries of the land sold fixed and steadfast where he saw fit, and thus put it, in regard to what was sold and intended to be sold, high and dry above all such contingencies, – a very needful thing in places and times of trouble about doubtful boundaries. There was no mistaking—could be none · on the part of John Orr, the purchaser; for the wrong thing was, for his occasion and for his benefit, expressly made the right thing, by one who had the power to make it so rightfully. For a full discus-

sion of the subject of correcting mistakes in written instruments, see *Page* v. *Higgins*, (Mass.) 5 Lawy. Rep. Ann. 152, notes (s. c. 22 N. E. 63).

Still, all this, in one view, might have left untouched the question for the court of law and jury in the action of ejectment, viz.: Taking the deed as we find it, to what land is it to be applied, as its proper subject-matter? And this fact was not necessarily decided by the court in dismissing plaintiff's bill. Plaintiff says that the land in controversy was left out of the John Orr deed by mistake of the agent. Defendants say that it was left out properly, because it was not the contract that it should be included. And yet the court may have reached the conclusion that it was already included, and that, therefore, there was no mistake to rectify by the reformation of the deed, and for that reason dismissed the bill; or may have decided that there was no ground for reformation, and dismissed the bill, leaving the legal effect and application of the deed, as it was, to be determined, as a legal question, by the court of law in the action of ejectment; or may have held that it was not intended to be included, and for that reason dismissed the bill, or that, whether included or excluded, the deed, as it was, was as it was intended to be, and there was no mistake to correct. But the court, in refusing to set aside the confession of judgment, and awarding a writ of possession, necessarily passed upon the legal effect of the deed, as it is, in regard to the land which it embraces and conveys. Thus, we see that no fault can be found with plaintiff's case as made by the pleading, but in the proof it breaks down utterly. The equity of the case being gone, did the court do right in going on to settle against the plaintiff all the questions involved in the action of ejectment (that is to say, that she was guilty of unlawfully withholding the premises claimed by the plaintiffs in the declaration), and letting the judgment confessed under conditional compulsion stand good against her, and awarding plaintiffs a writ of possession?

The plea of not guilty, in the statutory action of ejectment (and the defendant may plead the general issue only), means that the defendant is not guilty of unlawfully withholding the premises claimed by the plaintiff in

the declaration; and upon such plea the defendant may give in evidence any matter which, if pleaded in the former writ of right, would have barred the action of the plaintiff; and being the only plea (with exceptions that need not be noticed), it is, of necessity, broad and comprehensive. The issue involves no comparison of titles, but the defendant can rest upon his oars, relying upon his *prima facie* ownership, which his actual possession under the law gives him, until the true, legal owner comes, and can demand the showing of a connected chain of the legal title, going back, link by link, to Edward Braiden, from whom both titles branch out as from a common root or stem.

And next it is contended by plaintiff in the bill (defendant in the ejectment) that her John Orr deed, under which she claims, carries her up to, and for 770 poles along with, the division line of 1832, created by the deed of partition, no matter where that line may be, without any correction or reformation, whatever, and that the true location of that line has not yet been determined, and can only be fixed and ascertained in an action of ejectment, and that conceding that the court properly refused to reform her deed so as to bring her up, by express call, to the Talkington division line, yet it was error not to have set aside the judgment confessed as a *sine qua non set* by the court to award the injunction, so that she might defend her right to all the land comprised within the boundaries set forth and defined in her deed, whatever such boundaries may be found by a jury to be. I am inclined to think that the court below, in the chancery suit, properly went on to decide this question, and, with the aid of the exhaustive and abundant testimony on the subject, was able to read the Orr deeds, and apply them to their appropriate subject-matter, standing in the shoes of the vendor and vendee as nearly as one can now be placed, and came to the conclusion that it was a plain case for the application of the maxim of interpretation and construction of instruments, in regard to their subject-matter, that a false description does no harm when there is enough left to designate the subject-matter with reasonable certainty, and that such false description or repugnant call must be qualified or wholly rejected.

See Pars. Max. (7th Ed.) p. 629. No monument could be made more fixed and stable than where the two lines out of three of the lot of one thousand acres (No. 1.) meet, at the crossing of Archie's Fork, near Abraham Ice's field. The running which was done at the time, and the location of this corner, together with the map then made of the lands run off, as appears by the plaintiff's own evidence, and her witness W. V. Hoge, show beyond any reasonable doubt that the calling of the line running N., 22 E., 770 poles, the division line, is a description of such line manifestly false,. and therefore to be rejected or disregarded, which can be done without impairing in the slightest degree its certainty of location according to the intention of the contracting parties. And the calls of the one thousand acre tract (No. 2.), which begins at this same corner, at the crossing of Archie's Fork, runs with lot No 1, and back to the beginning, to and with the Carlin tract, of about three hundred acres, which has definite and fixed corners, whereas the John Talkington division line, as we have seen, runs some poles to the west, not crossing Archie's Fork at all. This (passing upon the legal construction of this deed, and ascertaining its proper subject-matter) was germane to, and grew out of, the determination and settlement of the equity set forth in the bill, and was inseparably connected with, and dependent upon, the adjudication of the equitable question involved. See *Foster* v. *Winchester.* It is a well-established rule that equity, having taken jurisdiction for one purpose, will retain it for others necessary to the final settlement of all matters involved in the litigation between the parties, growing out of, and connected with the subject-matter of the suit. 1. Beach, Mod. Eq. Jur. § 21 (see cases cited); *Gormley* v. *Clark,* 134 U. S. 338, (10 Sup. Ct. 554); *Beecher* v. *Lewis* 84 Va. 630, (6 S. E. 367); *Walters* v. *Bank,* 76 Va., 12, 19. The principle is almost universal that jurisdiction of the subject-matter ·does not depend upon the ultimate existence of a good cause of action in the particular case. Where equity has acquired jurisdiction upon equitable grounds, it may go on to complete adjudication, establish legal rights, and grant legal remedies otherwise beyond its scope; and no fact subsequently ascertained, showing want

of good cause of action in the particular case, can defeat
that jurisdiction. I think, therefore, that in this case the
jusisdiction of the court of equity rightfully attached to
the determination of this question of boundary; that it is a
matter that should no longer be open, for it is a matter ad-
judged on the pleadings, and rightfully, beyond all reason-
able ground of fair questioning; and that such decision
should not be made conclusively effectual on that point.

But in this case the plaintiff, Mrs. Robinson, contends
that her ground of equitable relief was distinct from the
grounds of her defenses at law, which she should not have
been compelled to abandon by the confession of judgment
in the action of ejectment which was exacted of her. See
1 High, Inj. § 59, citing *Warwick* v. *Norvell,* 1 Rob. (Va.)
308; *Knott* v. *Seamands,* 25 W. Va., 99, 104; *Miller* v. *Miller,*
*Id.* 495; *Manufacturing Co.* v. *Henry's Adm'r,* 25 Grat.
575; *Thornton v. Thornton,* 31 Grat. 212. "When a de-
fendant in an action at law files a bill to make his defense in
equity (as in this case, on the sole ground of mistake), and
asks for a stay of proceedings in the court of law, it is a
matter in the discretion (sound discretion) of the chancel-
lor, in granting the injunction, whether he will or will not
require a confession of judgment in the action at law. In
such case, if a confession in the action at law is required,
the order should require the judgment to be taken 'to be
dealt with as the court shall direct.' And though the or-
der requiring the confession of judgment is absolute, yet
if the court dissolves the injunction and dismisses the bill
on the ground that the plaintiff's defense to the action is
legal, and the court of equity has no jurisdiction, the de-
cree should direct that the judgment at law should be set
aside, and the case reinstated as it was when the injunc-
tion was granted. And, if this is not done, the chancellor
will, on motion afterwards made, direct the judgment to
be set aside. See *Manufacturing Co.* v. *Henry,* 25 Grat.
575,—a leading case on the subject."

The foregoing is adopted from the opinion of JUDGE
HOLT, as, in so far as it goes, properly propounding the
law of this case. There is no question that on a proper
showing the chancellor may set aside a confession of
judgment, but, where there is nothing to justify such

course, it is error for him to do so. The bill fully sets out the only apparent controversy between the parties, and, by its allegations, precludes the existence of any other, and amounts to this: That the defendants and plaintiff are the owners of a five thousand-acre tract of land, which formerly belonged to Edward Braiden; that out of the same was first carved two thousand acres, by metes and bounds, which is now owned by the plaintiff; that the defendants, by sundry transfers, then became the owners of all the residue of the whole tract; that plaintiff's two thousand acres had been improperly laid off so as not to include the land in controversy, according to the original intention of Braiden and his grantee, Orr, through whom she derives title, and yet she did get, and now holds, the full two thousand acres purchased, and to have extended her boundary as she claims it should have been, would take five hundred acres more of land, and give it to her, and reduce the defendants' holding to this extent, which, as held in this opinion, would be unjust and inequitable. This is the only controversy that is in any manner shown to exist between the parties, either in this or the ejectment suit. She is not entitled to this land, and the defendants are entitled to it. Then why should this litigation be continued? She filed her bill. The chancellor agreed to hear her, and settle the controversy, if she would confess judgment at law. She did so. The chancellor found against her, and by that decision she is bound, both in equity and at law. But in her written motion to set aside the confession she suggested that she had other defenses to the action of ejectment. She does not disclose what they are, or give the court any light by which it may determine whether they are substantial, or merely pretended and visionary. This it was her duty to do before the judgment could be set aside. Equity discourages unfounded litigation, and seeks to end all unnecessary controversies. It therefore not appearing that the plaintiff had any just, legal defense to the action of ejectment, the circuit court committed no error in refusing to set aside the confession of judgment, and the decree is affirmed.

*Affirmed.*