# CHARLESTON

HOME GAS CO. *v.* MANNINGTON CO-OPERATIVE WINDOW GLASS CO. *et al.*

Submitted September 7, 1907.  Decided December 17, 1907.

1. CONTRACTS—*Rescission—Fraud.*

    To justify rescission of a contract for fraudulent representation in procurement thereof, such representation must be a positive statement of a material existing fact, present or past, made for the purpose of procuring the contract, and actually relied on by the other party, who must be misled thereby.  (p. 269.)

2. EVIDENCE—*Written Contract—Parol Negotiations.*

    In absence of fraud or mistake, when an agreement is reduced to writing all previous negotiations resting in parol are resolved into and extinguished by the writing, it being the highest and safest evidence of the true final agreement of the parties to it.  (p. 273.)

3. SAME.

    This rule would inhibit engrafting on a contract prior or contemporaneous conversations or stipulations, not carried into the written contract, so as to add to or conflict with the agreement spoken by the writing itself.  (p. 274.)

4.  INJUNCTION—*Action at Law—Judgment—Discretion.*
     Whether confession of judgment by a defendant at law will be
     required as a condition of granting him an injunction to restrain
     the proceeding at law, is within the sound discretion of the
     court.   (p 274.)

5.  SAME.
     Where such defendant has a legal defense to the action at law
     on which he relies, as well as a distinct ground for equitable
     relief, he should not be required to abandon his legal defense by
     confessing judgment before proceeding in equity to enjoin the ac-
     tion at law.   (p. 274.)

Appeal from Circuit Court, Marion County.

Suit by the Home Gas Company against Mannington Co-
Operative Window Glass Company and others. From a
judgment for plaintiff, defendant Mannington Co-Operative
Window Glass Company appeals.

*Reversed and Decree of Dismissal Ordered.*

J. B. HANDLAN, for appellant.

W. B. CORNWELL and W. S. HAYMOND, for appellee.

MILLER, PRESIDENT:

July 9, 1900, plaintiff entered into a contract in writing
with F. J. Barrett and R. W. Gipson, whereby it agreed to
sell to them natural gas for five years from October 1,
1900, barring "accidents and unavoidable contingencies" in
the business of either party, for the purpose and in quantity
sufficient to supply "a window glass manufactory of *at least
twelve pots,*" measured by meter, at two and one half cents
per thousand cubic feet, delivered at the window glass fac-
tory then being erected by Barrett and Gipson at Man-
nington in Marion county; it being "specially understood
and agreed that, in the event the said party of the first
part shall before the expiration of the aforesaid five years
sell or dispose of its property and business, or should the
same undergo any radical or material change, the said parties
of the second part shall be protected in their rights under
this agreement, and such provision shall be made as will guar-
antee and secure to the said parties of the second part gas as
herein contracted for."

At the time the negotiations leading up to this contract
began, Barrett and Gipson represented themselves and asso-

ciates, all window glass workers residing in Indiana, who had resolved to seek a location in some gas belt in Ohio or West Virginia, organize a corporation and build a window glass factory. Among other places, Barrett and Gipson visited Mannington, and were directed to the Home Gas Company; and their negotiations were with C. R. Snodgrass and Wm. H. Furbee, respectively its president and secretary. At home they had received an offer of free gas, and at Clarksburg an offer of gas at four cents per thousand cubic feet and a building site, of both which they informed Snodgrass and Furbee. It appears that the Home Gas Company was organized particularly to supply gas cheaply and to induce industrial enterprises to locate at Mannington. Barrett and Gipson were particularly anxious to obtain a flat rate, or fixed price per month, for gas to supply their proposed plant. They returned home to Indiana, leaving with the plaintiff a proposition of $200 per month, taking with them to their associates a proposition from the plaintiff of three cents per thousand cubic feet, and were followed by a letter from the plaintiff to Gipson of June 26, 1900, saying: "Since you and Mr. Barrett were here we have taken up the question of a gas rate for your proposed window plant, and have concluded that the meter is the only way to properly arrive at the matter. We stand to our original proposition of three cents per thousand, and hope you will conclude to settle permanently with us."

In response Barrett and Gipson returned, authorized to accept this proposition if better terms could not be secured, and, after some further negotiations, concluded the contract referred to. They removed at once to Mannington, secured a location and began erection of the plant, the corporation being organized and a number of their associates having followed soon after to assist in the work of construction. The plant was completed early in November, 1900; and, connection being made with the gas line of the plaintiff, manufacture of glass was begun.

It developed almost immediately that the plaintiff had not sufficient gas for the window glass company to operate its plant. Complaints were lodged with the plaintiff, and promises of better supply made but not fulfilled, greatly hindering and delaying the glass company. Pending ful-

fillment of these promises, permission was sought and obtained from the plaintiff to disconnect temporarily and procure gas to operate the plant from other companies. Subsequently, when application was made by the glass company to again connect with the plaintiff's gas line, the request was refused, and the glass company was thereafter compelled to and did secure gas elsewhere to operate its plant—notifying, at first in writing and afterwards verbally, the gas company of its purpose to rely upon its contract and to hold it liable for damages. But these notices had no other effect than to bring a proposition from the plaintiff to enter into a new contract to furnish gas at the higher rate of four cents per thousand cubic feet, which was declined.

In February, 1904, the window glass company instituted in the circuit court of Marion county its action in *assumpsit* against the gas company to recover damages for such alleged breach of said contract, the bill of particulars claiming $16,465.65, or the difference between the contract rate and the price plaintiff had been compelled to pay with interest. The gas company appeared and filed the pleas of *non-assumpsit* and *non est factum;* but, before that case was finally brought to trial, the present bill was filed to cancel and annul said contract, and a temporary injunction obtained restraining prosecution of said action.

The sole ground alleged for equitable jurisdiction is that " said contract and its execution was procured and obtained from the plaintiff by the said F. J. Barrett and the said R. W. Gipson by their fraud and deceit, at least by the fraud and deceit of the said F. J. Barrett, practiced upon and misrepresentations made to the officers, agents, directors and stockholders of this plaintiff;" that Barrett and Gipson represented "that six to eight million cubic feet of gas per month would run said glass plant, and that under no circumstances would it require more than eight million cubic feet for any one month," the bill alleging and the evidence showing that a much larger quantity was required. Besides this equitable defense to said action, the bill further alleges that the plaintiff has legal defenses thereto upon which it relies, namely: (1) that it denies the right of the window glass company to recover in said action of *assump-*

*sit;* (2) that said window glass company committed the first breach of said contract by cutting loose from its glass plant the gas line of the plaintiff and quitting use of said gas; (3) that an unavoidable contingency in the business of the plaintiff arose rendering it unable to perform said contract and discharging it from further performance.

Gipson and Barrett, who had assigned the contract to the glass company, were made parties to the bill; but no relief or discovery was prayed against them. The answer of the glass company fully denied all material allegations of the bill. Gipson, who had evidently become unfriendly to the glass company, answered, giving some slight color to the charge in the bill of fraudulent representation. Barrett did not answer; but his deposition supported all denials in the answer of the glass company.

Upon final hearing, after many depositions had been taken and filed, the court decreed that the injunction theretofore awarded be perpetuated in so far as the window glass company might claim a quantity of gas exceeding eight million cubic feet per month; that the temporary injunction be dissolved in so far as the window glass company might have the right to demand damages arising from breach of said contract by failure to furnish gas to the extent of eight million cubic feet per month; that the issue of fraud in procurement of said contract be submitted to the jury in said action at law, along with the issue of the liability of the gas company to furnish eight million cubic feet of gas per month under said contract; that the action at law do proceed, treating said contract as a contract by the gas company to furnish to the window glass company gas in a quantity not exceeding eight million cubic feet per month; the court refusing to decree complete dissolution of the preliminary injunction, or to require the gas company to confess judgment for all or any part of the claim for damages made in the action at law.

From this decree the window glass company has appealed; and the gas company cross-assigns as error that the court below did not grant all the relief prayed for. The effect of this decree was to modify the contract, by injecting into it terms wholly inconsistent with its actual provisions—

terms which the bill does not even allege were for any reason omitted or were agreed to, and for which there is no prayer—and to leave the subject of fraud, the only ground of equitable jurisdiction, to the tender mercies of the jury in the trial of the action at law. Upon what principles of pleading or practice such a decree can stand, we are unable to discover. If fraud was properly alleged and proven in the opinion of the court, the decree should have been for the full measure of relief prayed for; but, without allegation, prayer and proof respecting such a modification of the contract, the decree was improper.

The question then recurs, was the plaintiff entitled to any relief? We think not, certainly not that which the court thus undertook to give. The evidence shows conclusively that, after all negotiations had ended and the terms of the contract had been agreed on, Snodgrass, president of plaintiff, without the presence of either Barrett or Gipson, procured his brother, a stockholder and the attorney of his company, to prepare the contract, and did not withhold from him any material fact or provision of the contract as agreed to; that, after the contract was thus prepared, copies thereof were presented to Gipson and Barrett, and, being satisfactory to them, executed by both parties. A familiar rule in the construction of contract is, that the terms must be construed most strongly against the party proposing it or by whom it has been prepared. By the contract the plaintiff bound itself to furnish sufficient gas to supply a window glass factory of *at least* twelve pots. Evidently this provision contemplated, by its very terms, a larger plant requiring more gas than the alleged estimate of the quantity required to supply a twelve-pot plant. Can it be conceded that this contract, so anticipating larger works than a twelve-pot plant and providing for the supply of gas at a meter rate, was based upon the supply of gas limited to eight million cubic feet per month. Nobody pretends that six or eight million feet were discussed in any other connection than with reference to twelve-pot plant.

But the alleged representation was not of an existing fact. From its very nature, it amounted to a mere expression

of opinion. Who could say with any degree of certainty how much gas would be required to supply a plant of twelve pots? Would not the quantity required depend upon the quality of the gas, the conditions under which it was burned, the pressure perhaps at which it was delivered, the temperature and the like? Certainly it was a most indeterminate quantity; and no one was so likely to know this as plaintiff's officers, who had charge of its business and had been and then was supplying another similar plant. While the bill charges knowledge on the part of Gipson and Barrett as to the quantity of gas to be required, the proof wholly fails to sustain the charge. They were practical glass workers, but had no experience in the practical management of the glass plant where they had previously worked, in a field where gas was furnished at a flat rate; and they stated, as a reason why they wished to secure that form of contract, that they did not know anything about the use of gas by meter measurement. It has been held by high authority that even fraudulent expressions of opinion are insufficient to justify rescission of a contract executed and acted upon by the parties. *Johansson* v. *Stephanson*, 154 U. S. 625. The rule that the representation must be of a material existing fact was applied in *Buena Vista* v. *Billmyer*, 48 W. Va. 382, in case of a sale of town lots, where the representation was that certain future things would be done—that a steel plant and boiler works would be erected in the vicinity of the lots, at which a large number of men would be employed. The court said: "Now if he had made a false statement as to any existing fact, whether he knew it to be true or not, and had thereby misled the defendant in the purchase of the lots, then the company would have been liable."

In making such a contract as the one in question, can we give credence to the pretension of the plaintiff that its execution of the contract was based on the alleged representation of Barrett and Gipson that they would require for a twelve-pot plant not exceeding eight million feet per month? The provision of the contract to supply sufficient gas to run at least a twelve-pot plant by meter measurement, precludes any such notion. That they did not rely upon this alleged representation is made most manifest by

the character of the negotiations leading up to the contract. It is conceded that whatever was said by either Gipson or Barrett respecting the probable quantity of gas required was made in connection with their effort to procure the flat rate. Bartlett, vice-president of plaintiff and present at the final negotiations, admits in his testimony that Gipson and Barrett were very uncertain as to the quantity themselves. It is proven also by Barrett that, just before the contract was finally agreed to, when inquiry was made of him and Gipson as to what quantity of gas they thought would be required and it was stated to them by the plaintiff's officers that they thought six to eight million feet was about the amount consumed by the other glass plant at Mannington then being supplied with gas by plaintiff, they answered it might take eight million feet or it might take probably fourteen million, that then the proposition was made by the plaintiff to charge them two and one half cents per thousand cubic feet for all gas used up to eight million feet, and after that three cents per thousand, this proposition being met by them with the counter proposition of two and one half cents per thousand feet for all gas they might consume, which latter proposition was accepted and carried into the written contract. The letter of Snodgrass to Gipson referred to shows the plaintiff did not rely on any such alleged representation of Gipson and Barrett. They refused to enter into a contract, unless gas should be supplied by meter. A representation must be of a material existing fact, present or past, and actually relied upon by the other party, who must have been misled. *Wamsley* v. *Currence*, 25 W. Va. 543; *Pennybacker* v. *Laidley*, 33 W. Va. 625. It must appear that the misrepresentations were positive statements and material allegations made for the purpose of procuring the contract, and that the party to whom they were made relied upon them. *Max Meadows Co.* v. *Brady*, 22 S. E. 845; *Crislip* v. *Cain*, 19 W. Va. 439.

Fraud being eliminated, another familiar rule applicable is that when an agreement is reduced to writing all previous negotiations resting in parol are resolved into and extinguished by the writing, it being the highest and safest evidence of the true final agreement of the parties to it. *Insurance Co.* v. *Board of Education*, 49 W. Va. 377;

*Martin* v. *Railroad Co.*, 48 W. Va. 542; *Knowlton* v. *Campbell*, 48 W. Va. 294; *Buena Vista* v. *Billmeyer, supra; Towner* v. *Lucas*, 13 Grat. 705. These authorities illustrate the proper application of this rule to the facts in the case at bar, and pronounce an inhibition against engrafting upon a contract prior or contemporaneous conversations or stipulations, not carried into the writing, so as to add to or conflict with the agreement spoken by the writing itself. It would be useless to elaborate this subject.

The question of *laches* has been presented; but the view we have taken of the case makes it unnecessary to apply this doctrine. Nor need we respond to the arguments on either side respecting the legal defenses set up in the bill.

The refusal of the court below to require confession of judgment by the plaintiff is complained of, and we are urged to dispose of the case here on the merits. But this is a court of appeals, not of original jurisdiction. Whether a confession of judgment should be exacted was a question addressed to the sound, not arbitrary, discretion of the circuit court—subject, it is true, to review here; but unless we can say there was an abuse of that discretion, we ought not to disturb the decree on that account. *Knott* v. *Seamands*, 25 W. Va. 104; *Parsons* v. *Snider*, 42 W. Va. 517; *Robinson* v. *Braiden*, 44 W. Va. 183; *Dudley* v. *Miner*, 93 Va. 408; *Henley* v. *Cottrell*, 101 Va. 70. Although it was alleged the plaintiff had a distinct equitable defense based on fraud, yet it is also alleged it had a complete defense at law. In such cases, where it appears, as we think it does here, that plaintiff relies on his legal defenses, he should not be obliged to abandon these defenses by confessing judgment, before proceeding in equity to enjoin the action at law. *Knott* v. *Seamands, supra; Robinson* v. *Braiden, supra.* There was therefore no abuse of the discretion by the court in this case.

The pleadings and proofs do not seem to us to have contemplated finality except on the issue of fraud. The case is not one of concurrent jurisdiction. We might do an injustice. The ultimate end of the case here, as it should have been in the circuit court, is to adjudge the plaintiff not entitled to the relief prayed for, the fraud alleged not being

proven, and to dismiss the bill. An order will be made accordingly, giving judgment in favor of the defendant against the plaintiff for costs incurred herein and in the court below.

*Reversed, and Decree of Dismissal Ordered.*