TOLEDO COMPUTING SCALE CO. v. COMPUTING SCALE CO.

(Circuit Court of Appeals, Sixth Circuit. January 20, 1906.).

No. 1,439.

1. COURTS—UNITED STATES COURTS—STATE LAWS AS RULES OF PROCEDURE— SERVICE ON FOREIGN CORPORATIONS.

While service of subpœna from a federal court in equity upon a nonresident corporation is not controlled by state statutes, yet, where there is no applicable provision of a federal statute, the procedure of the state statute, if deemed proper and reasonable, will be followed as, for instance, when the state statute declares what persons shall represent the corporation in receiving service of process.

[Ed. Note.—Service of process on foreign corporations, see note to Eldred v. American Palace Car Co., 45 C. C. A. 3.]

2. CORPORATIONS—FOREIGN CORPORATIONS—SERVICE OF PROCESS—MANAGING AGENT.

Under Rev. St. Ohio 1906, § 5043, which provides that "when the defendant is a foreign corporation, having a managing agent in this state, the service may be upon such agent," as construed by the Supreme Court of the state, the person who chiefly represents such a corporation as agent for the sale of its goods in a locality in the state, and who maintains an office or storeroom where such goods are kept, is a managing agent, within the meaning of the statute, although he is paid only by commissions on sales made within his district.

3. EQUITY—JURISDICTION—MODE OF TAKING OBJECTION.

The objection that equity is without jurisdiction to grant an injunction, on the ground that there is an adequate remedy at law should be taken in limine before answering to the merits, and, if not so taken, it will not be considered, where the remedy is at least suitable on the case made by the bill.

[Ed. Note.—For cases in point, see vol. 19, Cent. Dig. Equity, §§ 173–176.]

4. EQUITY—MAXIMS—COMPLAINANT MUST HAVE CLEAN HANDS.

Complainant made and sold a "Butcher's Computing Scale" which it stated in its circulars to the trade would make a dealer a profit of 3

per cent. even if he sold at the same price per pound he paid. This was done by so constructing the computing mechanism that the price shown by the scale for the draft weighed was that for the next even numbered ounce above the actual weight. *Held*, that complainant had no standing in a court of equity to entitle it to a preliminary injunction to restrain a competitor from calling the attention of purchasers and the public to the fraudulent and dishonest character of such scale, where the proofs on the motion disclosed such facts.

[Ed. Note.—For cases in point, see vol. 19, Cent. Dig. Equity, §§ 185–187; vol. 38, Cent. Dig. Patents, § 449; vol. 46, Cent. Dig. Trade–Marks and Trade–Names, §§ 25, 94.]

Appeal from the Circuit Court of the United States for the Southern District of Ohio.

Clarence Brown, for appellant.

J. W. Warrington and J. A. McMahon, for appellee.

Before LURTON, SEVERENS, and RICHARDS, Circuit Judges.

SEVERENS, Circuit Judge. This cause comes here on appeal from an order of the Circuit Court granting an injunction pendente lite upon a bill filed by the appellee for the purpose of restraining the appellant from embarrassing and injuring its business by the publication and dissemination of circulars charging that a certain scale called a Butcher's Computing Scale, manufactured and sold by the complainant, was a false and dishonest scale, and was made and sold by the complainant for the purpose of enabling the user to deceive and defraud the public by giving false weight, that is to say, not so much as the purchaser would suppose he was buying. The bill also charged that the defendant by its agents made like representations to intending buyers of such scales, and to those who had already bought them of the complainant, and urged the latter to desist from their use, and to return them to the complainant and recover the purchase price when paid or to resist payment when it had not been paid, offering assistance in any legal controversies that might arise from such action; and further represented that the persons using those scales were liable to arrest and punishment therefor. Affidavits in support of the bill were filed. Upon notice of a motion for a preliminary injunction, the defendant appeared and filed an answer, supported by affidavits, in opposition thereto. The answer is lengthy, containing many averments of alleged facts tending to establish the main defense, which was that the charges contained in the circulars and in the representations of its agents were true. Some minor charges made by the bill were denied, but the principal controversy which we are now required to consider and determine is the issue joined on the main defense above stated.

There are, however, two preliminary questions raised by the appellant which should first be disposed of.

1. The "Toledo Computing Scale Company" is a New Jersey corporation having its principal office at Toledo in the Northern district of Ohio. The "Computing Scale Company" is an Ohio corporation whose principal office is at Dayton, in the Southern district of the same state. Original process was served by the marshal on J. Knoop

as managing agent of the defendant at Cincinnati. A subpœna was also served on the defendant·at Toledo, but as that was not in the district where the suit was pending, it is not relied upon as valid service. Section 5043 of the Revised Statutes of Ohio reads as follows:

"When the defendant is a foreign corporation, having a managing agent in this state, the service may be upon such agent."

The defendant moved on affidavits to dismiss the cause upon the ground that Knoop was not a "managing agent" of the corporation. By consent of counsel, depositions of several persons were taken bearing on this question. The following is a summary of the facts found by the court upon this issue, and of some further facts which also appear in the record. Sales of the defendant's scales were made by commission agents. A large extent of territory including cities in Ohio, Michigan, Indiana, and, apparently, Kentucky, were in charge of one, Dusseau, as supervising agent, who was paid by a commission. This territory was divided up into districts for each of which a salesman was appointed by the supervising agent subject to the approval of the company. Knoop was one of such appointees and his district included the counties of Hamilton (in which is Cincinnati) and Clermont, in Ohio, and Boone, Campbell, and Kenton, in Kentucky. The salesmen canvass their territory for buyers, sell and make contracts for the sale of scales in accordance with prices and terms of payment prescribed by the company, deliver the scales to the purchaser, receive the purchase price in money or notes, and forward the same directly to the company, and receive a commission thereon of 30 per cent., which is remitted to them by the company by check; make requisitions on the company for scales, and keep on hand as many as in their judgment the trade may require; take orders for repairs, collect debts from customers, and are held responsible for bad debts to the extent of 5 per cent. of their commission; they also circulate advertising matter, and do anything else in the conduct of the business required of them by the company. If sales are made in their territory by the supervising agent or the company, they receive the commission therefor. The supervising agent provides an office or storeroom where the scales are kept and business is transacted by the salesmen. At the office there is a sign: "Toledo Computing Scale." The rent for the office is paid by the supervising agent but this expense is covered by the commission which he receives. The defendant was carrying on a large business at Cincinnati and other places in the district and had no other representative there except salesmen of whom Knoop was the chief in the territory assigned to him. All scales for that territory were consigned to him, and he became responsible for them and for the prices received for them whether actually sold by him or his helpers. He also kept his company advised of the doings of its competitor, the complainant, in his district. Upon these facts the court held that Knoop was a managing agent within the meaning of the Ohio statute above quoted as construed by the Supreme Court of that state, referring to American Express Co. v. Johnson, 17 Ohio St. 641, and Railroad Co. v. Transportation Co., 32 Ohio St. 135. The court properly held that the statute of the state might be adopted as a guide for

making service of process in such cases, and that its construction by the Supreme Court of Ohio was to be accepted as correct. While service of a subpœna from a Federal court in equity upon a nonresident corporation cannot be controlled by state statutes, yet, when there is no applicable provision of a federal statute the procedure of the state statutes may be followed, if deemed reasonable and adapted to the purpose. Mutual Iife Ins. Co. v. Spratley, 172 U. S. 602–610, 19 Sup. Ct. 308, 43 L. Ed. 569; Mutual Reserve Association v. Phelps, 190 U. S. 147, 23 Sup. Ct. 707, 47 L. Ed. 987; Board of Trade v. Hammond Elevator Co., 198 U. S. 424, 25 Sup. Ct. 740, 49 L. Ed. 1111. Referring to the case of United States v. Bell Telephone Co. (C. C.) 29 Fed. 17, Judge Thompson, who sat in the court below, said:

"These cases [meaning the Ohio cases just cited], were not referred to by Judge Jackson in the Telephone Case, nor had he occasion to refer to them, because the facts in that case did not call for a construction of section 5043, but, on the contrary showed conclusively that the Telephone company had no agent within the jurisdiction of the court. His definition of a managing agent was obiter in respect to the case before him."

The Ohio Supreme Court evidently intended to give a liberal interpretation to the statute to facilitate the obtaining of jurisdiction over foreign corporations doing business in the state, and held that one who chiefly represented the corporation in a locality where it was doing business was its managing agent there. And indeed a construction of this statute which restricted the meaning to one who was a general manager would very much limit its utility.

As was said by Mr. Justice Gray in Barrow Steamship Co. v. Kane, 170 U. S. 100, 106, 18 Sup. Ct. 526, 528, 42 L. Ed. 964:

"The constant tendency of judicial decisions in modern times has been in the direction of putting corporations upon the same footing as natural persons in regard to the jurisdiction of suits by or against them."

But it is enough to say that we think the circuit court did not err in following the state court's interpretation of the law and overruling the motion to dismiss.

2. It is further contended that this suit being a suit in equity, ought not to be entertained, because there exists an adequate remedy in an action at law for the recovery of damages. We greatly doubt whether the legal remedy would be adequate. It would be difficult to estimate the damages arising from the destruction or serious impairment of one's business, and the better, more efficient and certain remedy would be an injunction restraining the defendant from perpetrating the wrong. Besides the injury complained of is a continuing injury and would involve the necessity for a multitude of suits. But if this objection were maintainable it should have been taken in limine, before answering to the merits. 1 Dan. Ch. Pl. & Pr. (4th Ed.) 550, note; Reynes v. Dumont, 130 U. S. 354, 395, 9 Sup. Ct. 486, 32 L. Ed. 934; Kilbourn v. Sunderland, 130 U. S. 505, 9 Sup. Ct. 594, 32 L. Ed. 1005; Brown v. Lake Superior Iron Co., 134 U. S. 530, 10 Sup. Ct. 604, 33 L. Ed. 1021; Perego v. Dodge, 163 U. S. 160, 16 Sup. Ct. 971, 41 L. Ed. 113; Reynolds v. Watkins, 60 Fed. 824, 9 C. C. A. 273; McConnell v. Prov. Sav. Life Assur. Soc., 69 Fed. 115, 16 C. C. A. 172; Elder v. McClaskey, 70 Fed. 529, 554, 555, 17 C. C. A. 251.

The right to a trial by jury when there is a suitable remedy at law in confirmed by Rev. St. § 723 [U. S. Comp. St. 1901, p. 583]. But that right is one which the defendant may waive; and he does waive it if he answers to the merits without claiming it. This, of course, does not preclude the court from raising the objection if the case made by the bill is plainly unsuitable for the exercise of the jurisdiction of a court of equity. But no one can, as it seems to us, doubt that the remedy by injunction is, at least, suitable to the facts of such a case as this, if the complainant is entitled to any relief whatever. We are therefore to decide the case upon its merits. The appellant contends that the complainant did not come into court with clean hands; that the business it was seeking to protect was dishonest; that it involved the deceiving and defrauding of the public by the use of a false weighing apparatus, whereby the purchaser might be cheated in failing to get so much as he supposed he was buying; and that a court of equity would not lend its aid to such a business. No doubt the principle thus invoked is well established. It is a constant maxim of the court that it will not relieve a party, who seeks its protection in the prosecution of a dishonest business. The question before us is therefore one of fact. Were the scales of the complainant of the character imputed to them? The court below was of opinion that they were not. This being an appeal from an order granting a preliminary injunction, we should, as we have often held, give much weight to a finding of fact by the lower court, and accord to that court a large discretion. But the law which allows an appeal from such orders at this stage of the case requires that we should exercise our own judgment, and, while observing the rule just adverted to, form our own conclusions. In stating these we may properly also repeat what we have said in former cases; that is to say, that our conclusion is not final. In the nature of things it cannot be, for the case is not presented upon full proofs, and these may be such that the court below may, and ought to, come to a different conclusion from that which the present record compels.

The scales which are the subject of this controversy are called "computing" scales; that is to say, they weigh, compute at a given price per pound, and exhibit the whole price of the article placed upon the platform. This particular kind of computing scales is called the "Butcher's Scale" though it is said it may also be used by grocers, and consists of the ordinary scale platform having perpendicular standards at the rear which support the weighing and computing apparatus. A rod extends from the platform bearings upward to the weighing and computing apparatus and actuates by intermediate connections the spring device, which latter in turn actuates the indicating devices. This apparatus is contained in a horizontal cylinder having a slit along the front side of its length which discloses on an interior cylinder, by graduations along its length, the whole price computed upon the number of pounds having a definite relation thereto. On the face of the lower rim of the outer cylinder is a line of graduated prices per pound; and the column of total prices on the inner cylinder at that price per pound runs around the surface of the inner cylinder so that

the whole column of total prices is exhibited by a revolution of the inner cylinder, in the sectional plane thereof perpendicular to the price per pound marked on the outer cylinder. There is a slit on the opposite side of the outer cylinder showing the weight to the purchaser, but only· that—the minutiæ of the organization is too complex and elaborate to be readily understood without illustration by reference to the scale itself. The general principles upon which such scales operate are explained in the opinion of this court in Standard Computing Scale Company v. Computing Scale Company, 126 Fed. 639, 61 C. C. A. 541, in which several patents used in their construction were involved, and to which reference may be made. For the present purpose we shall suppose the complainant's organization of the particular scales in question to be such as will accomplish the results which the complainant claims, in its circulars to the trade, to be their superior advantages. The case before us does not involve the special consideration of other kinds of computing scales. The offenses charged to the appellant are in large measure the sequence of the distribution to the trade by the appellee of circulars descriptive of its "Butcher's Scale" and obviously intended to show the benefits which would accrue to the users· of them in selling butcher's goods to the public. One of such circulars· was this:

CAN YOU DO THIS?

ON YOUR SCALE

Buy 20 lbs. pork loins at 9c. a pound, retail them to your trade at the same price and get your money .back.

WE CAN

on our scale and make you

3 PER CENT PROFIT BESIDES.

If your business amounts to $10.00 a day sales WE CAN EARN YOU 30c. IN FRACTIONS YOU DON'T GET NOW. Thirty cents a day means you BUY THIS SCALE every 180 days. How long have you been in business? How many have you bought in that time? Think· of it.

ONE SCALE LOST EVERY SIX MONTHS.

LET OUR·MAN PROVE THIS.

MONEYWEIGHT SCALE CO.,

47 STATE STREET, CHICAGO, ILL.

On the reverse side of this circular was a picture of the scale, and it was said of it that "it gives the butcher the odd fractions to which he is justly entitled. This feature alone in the average meat and produce market will not only save the cost of the scale in a short time, but in a large market will save the clerks' hire, which saving on the old pound and ounce scale is entirely lost." It is suggested by counsel for the appellee that this circular was put out by the Moneyweight Scale Company, of Chicago, and that this was an independent company, for whose acts the appellee was not responsible. Both these companies· were constituents of the Computing Scale Company of America, a corporation owning the entire capital stock of these and other companies. All the officers of these companies were directors of the combination and the officers of the Moneyweight Company were officers·

of the appellee. The Moneyweight Company was a selling agent of the appellee. Moreover, the proof leaves no doubt that the circular was sanctioned and approved by the appellee. After this circular had got into the hands of the dealers in computing scales, the appellant, which was a rival manufacturer of computing scales, put out a circular headed "A Shameless Admission," which, after referring to the appellee's circular and scale, denounced them as dishonest, and warned the dealers and the public of the alleged deceitful character of the appellee's scale, and sent its agents among the trade to disseminate this charge against the appellee's scale and method of doing business.

We do not need to go into the particulars. It is only necessary to say that the proof is amply sufficient to show that if the appellee's scales are not deceitful and fraudulent, the conduct of the appellant was such as justly entitled the appellee to the injunction which the court ordered, or other appropriate remedy. If, on the other hand, the character of the appellee's scale and business was of the character charged, the injunction should not have been allowed, and this would be so on a ground quite independent of the merits of the appellant.

The circular of the appellee above set forth produces a strong impression upon our minds that the scales in question were designed for the purpose of enabling the users to impose upon the purchasing public by inducing the belief on the part of the latter that they were getting what they were paying for when in fact they were not. If these scales realized to the butchers what is claimed for them, they gained a distinct advantage over the ordinary method of weighing and fixing the price which the purchaser would understand to be the test of his bargain. He would have no understanding of the intricacies by which the result is reached. It is not intended that he will know. But he would doubtless suppose that in effect the result would be the same as in the familiar practice of weighing, and he depends upon the honesty of the scale and the man in charge of it to give him the equivalent of that effected by standard weights and measures. In fact the opportunity which these scales give the user to deceive his purchaser in this regard is the very thing which the makers of them hold out as the attraction to the buyers of the scales. The alluring suggestion to the user that he has been wronging himself by using common methods of weighing is in itself a confession that the new method is designed to enable him to gain an advantage which he has hitherto been unable to enjoy.

That the appellee was not unwilling that the trade should accept the appellant's representations regarding their scales is shown by a circular letter to their salesmen written soon after the distribution of the appellant's circular was commenced, which was as follows:

"To our salesmen:

"A circular has recently been sent out by the Toledo Company, headed, 'A Shameless Admission.' They reproduced a small circular like the inclosed, which we sent out in some of our form letters. This circular, as you will notice, calls attention to the fact that we can save a merchant 3 per cent. by the use of our scales. Their circular will undoubtedly be sent into your territory. When you first see this you may be startled. We were startled when we saw it, for it always startles us to have the enemy take up our cause and do as much good as this circular is doing. We have labored

many years trying to get the merchant to believe we were looking after his interests and save the fractions of a cent which belong to him. Our would-be competitor now comes along and indorses this proposition for us in such manner that the most skeptical cannot doubt our claims. So far, there have not been a great many of these circulars put out, but where we have heard from them we have reaped great results. * * * We hope they will flood the country with these before they wake up, for nothing in a long time has done us so much good."

And the truth seems to be that the scales fulfill in a substantial way the claim made for them. The bill informs us that during the four or five years since this particular kind of scale was invented between 50,000 and 60,000 of them have been sold in the United States. The testimony of the experts who are familiar with these scales confirms the claim of the appellee in respect to their advantage to the butcher. A demonstration of the operation of the scale made before us at the hearing confirms the belief that by its use the purchaser never gains, but the seller generally, possibly not always, gains over the results obtained by ordinary methods of weighing, and that this gain would be as much or more than 3 per cent., apparently considerably more.

The weight graduation is shown upon the scale by units of ounces. But the whole values are shown by graduations of two ounces, that is, for even numbered ounces, as 2, 4, 6, and 8 ounces, so that for every weight up to two ounces the price would be that for two ounces; for every weight from a little above two to four ounces the price would be the price of four ounces, weights from a little above four to six ounces would be valued at six ounces, and so on. This is effected by making the slit in the front of the cylinder wide enough to show at least two horizontal lines of total prices graduated as above explained, by two ounce variations. Immediately on increasing the weight on the platform beyond even numbered ounces, the lower line of total prices, showing the price for two ounces more, begins to appear, and is very soon apparent. The agents of the appellee instructed the dealers that the lower line was the one to be read when both lines were visible. The appellee's circular to the trade says, "Let our man prove this;" that is, how to use the scales in order to sell at cost and make the profit. And it would be the natural thing to expect that the user would read the lower line, if he was inspired with the purpose of the manufacturer; but more than this, the eye of the user would be fixed on the price per pound on the lower edge of the slit as his guide and the lower total price would be the one next contiguous to it. Perhaps if the total price on the upper, or disappearing, line were read the profit might not be realized. This would depend upon the accuracy of the intrinsic organization of the scale about which we have no clear information.

No prices are shown for any weights between even ounces. And in use no such computations are made. The special advantage attributed to all computing scales is that they dispense with calculations, and show to the operator just what the whole value is. So that any person who can read figures is competent to use them. The appellee says in one of its circulars which is pointedly addressed to butchers:

"Your Money Weight Scale gives you the value, and you make no calculations, the single operation of weighing does the work; and as you are

taught to place the same value upon your goods as you place upon your cash, it is hardly probable, when you realize that an ounce or two means, perhaps, that many cents that you will continue to give away."

And in another circular they say of their computing scales in general:

"This is the only absolutely automatic scale made, no counting or adding; put the goods on the platform and read the values in plain figures, a child can make no mistakes."

Alleged inaccuracies in the designation of whole prices by which they are made greater than they should be, even upon the scheme on which the scale is in fact constructed, are pointed out by counsel for appellant. But these are not so clearly demonstrated by the present record as to justify a definite conclusion.

We should require the impression which we get of the appellee's scale, and the business of making and selling it from its circulars and instructions, to be removed before we could sanction the employment of the process of the court in its protection. As the proof, so far, only serves to deepen it, we must reverse the order granting the injunction, and direct that the cause be proceeded with in due course.

It is so ordered.