LIFE ASSOCIATION OF AMERICA, Appellant, v. DAVIS R. BOOGHER, Respondent.

### December 18, 1876.

An injunction will not lie to restrain the publication of a libel. Courts have no power to suspend or abridge the right of every person to "freely speak, write, or print on any subject."

APPEAL from St. Louis Circuit Court.

*Affirmed.*

*Irwin Z. Smith* and *H. A. Clover*, for appellant, cited: Townsh. on S. & L. 90, sec. 52; Hoveys *v.* Rubber-tip Pencil Co., 33 N. Y. 522; Kerr on Inj. 2, 487; Brandreth *v.* Lance, 8 Paige, 24; Dixon *v.* Holden, Law Rep. 7 Eq. 488; Clover *v.* Roydon, Law Rep. 17 Eq. 190; Law J. 43 Eq. 665; Hill. on Inj. 568, note; Springhead Spinning Co. *v.* Riley, 37 Law J. 889; Prudential Assurance Co. *v.* Knott, Law Rep. 10 Ch. 142; Fisher *v.* Apollinaris Co., Law Rep. 10 Ch. 297; Flemming *v.* Newton, 1 H. L. Rep. Cas. 363; Rollins *v.* Hinks, 13 Eq. App. 355; Axmann *v.* Land, 18 Eq. App. 330.

*W. H. H. Russell, Robert W. Goode,* and *Marshall & Barclay*, for respondent, cited: Kerr on Inj. 2; 1 Joyce on Inj. 715; High on Inj., sec. 669; Hill. on Inj., 3d ed., 553, sec. 71; Brandreth *v.* Lance, 8 Paige, 24; Clark *v.* Freeman, 11 Bevan, 112; Prudential Assurance Co. *v.* Knott, Law Rep. 10 Ch. 142; Mulkern *v.* Ward, Law Rep. 13 Eq. 619; Clover *v.* Roydon, Law Rep. 17 Eq. 190; Fisher *v.* Apollinaris Co., Law Rep. 10 Ch. 297; Hammersmith Skating Rink Co. *v.* Dublin, etc., 2 Law & Eq. Rep. 192; Const. 1865, art. 1, sec. 17; Const. 1865, art. 2, sec. 14; Cooley's Const. Lim., 3d ed., 420 *et seq.;* Thursby *v.* Mills, 11 How. Pr. 116; Hill. on Inj. 34, sec. 43; Story's Eq., 10th ed., sec. 959 *a.*

GANTT, P. J., delivered the opinion of the court.

The Life Association of America, a corporation engaged in the business of life assurance at St. Louis, filed its petition charging that Boogher and one Taylor had been for a long time engaged in the composition, publication, and circulation of false, slanderous, malicious, and libelous statements (setting them forth) respecting the plaintiff, and that they threatened still further to circulate and publish, orally, in writing, and in print, said false, slanderous, malicious, and libelous statements, for the purpose of injuring, and in order

to levy black-mail on, the plaintiff; that the said Boogher and Taylor were wholly insolvent and irresponsible, and that plaintiff had, therefore, no available recourse to an action for damages ; and it asked for a restraining order to prevent the further publication of the libel, and the infliction on plaintiff of irreparable injury thereby.. This petition was verified by affidavit, and the court granted a preliminary injunction, which was afterwards dissolved upon a demurrer and motion at the return term. The plaintiff dismissed the suit as to Taylor. The demurrer assigned for reasons that the petition showed no case for equitable relief: that it prayed for what the Constitution of the State forbade ; that a court of equity had no jurisdiction to restrain the publication of a libel ; and that the application for a restraining order was not seasonably made. The court sustained the demurrer, dissolved the injunction, dismissed the petition, and assessed damages on the injunction-bond. Plaintiff appealed to this court. We are told in the petition, by way of aggravating the offense of the libeller, that his purpose was " to levy black-mail " on the plaintiff. No explanation is given of this phrase, and its use is hardly justifiable, for it cannot be considered quite intelligible. It certainly cannot be called plain English. Originally, we learn from philological authority, it had a definite but provincial meaning, familiar to those who inhabited the country periodically devastated by Highland robbers. It was, indeed, the tribute levied by these last on the peaceable but unwarlike inhabitants of the Lowlands of Scotland, which, being paid promptly, and at regular intervals, was a substitute for complete spoliation. In this country the phrase has been sometimes used in a metaphorical sense, to signify any unlawful exaction of money by an appeal to the fears of the victim, and we may conjecture that this use of it was intended by the draughtsman of this petition. But this conjecture cannot supply the demand made by the universal rule of pleading, that the complaint should be set forth in *plain* language, a statement

of the facts constituting the plaintiff's cause of action. In the case before us no change will have been made in the opinion we express by the failure to explain the circumstances of aggravation which are charged, for enough is stated to inform us that defendant has uttered a malicious, false, scandalous, and libelous statement respecting the plaintiff, and that with the purpose of inflicting injury on the plaintiff defendant proposes and threatens to repeat and enlarge the wrong and injury already inflicted; that the resulting loss to the plaintiff will be great, and irreparable by civil action, because of the insolvency of the defendant; and thereupon the aid of a court of justice is claimed, to prevent that for which, if perfected, it cannot give compensation.

It is obvious that, if this remedy be given on the ground of the insolvency of the defendant, the freedom to speak and write, which is secured, by the Constitution of Missouri, to all its citizens, will be enjoyed by a man able to respond in damages to a civil action, and denied to one who has no property liable to an execution.

We are of opinion that this discrimination was not intended by the framers of the organic law. It never was the purpose of them, or of those who have most strenuously advocated the freedom of the press or of speech, that any person should have unbridled license of tongue or pen. It is an offense against the peace of society that malicious libels should be uttered, even if true. The law does not justify the gratification of malevolent feelings by even true charges calculated to wound the feelings, blast the character, and exasperate beyond endurance the passions of their object. The guilt of the libeler is aggravated, almost infinitely, by the falsehood of the accusation; but it is no complete defense, in a criminal prosecution, that the defendant has stated no more than he stands ready to prove. In such a case as this petition states, there is a punishment provided by the criminal law. It is no answer to say that this

punishment is inadequate.   Courts do not sit to listen to such objections.   It is undeniable that, in such a case as the petition shows, the party slandered may have an action for damages.   But in such an action, irrespective of the suggestion of the absolute insolvency of the defendant, there is much room for saying that the legal remedy falls short of making full compensation for injury done, or of giving full protection against injury threatened.   To infer from this that recourse may be had to the preventive jurisdiction of a court of equity is clearly not allowable.   No human institutions are perfect.   That a judgment for damages is less efficacious to compensate or to deter, when the defendant is insolvent, is largely due to the prohibition of imprisonment for debt.   The exemption of a limited amount of a debtor's property from execution will in many instances disarm a judgment of its terrors, at least in part; yet these exemptions of the person and property of the defendant are part of the system under which we live, and courts of justice sit to administer, not to criticise, this system.   It remains true that a judgment for damages against any one, though incapable of enforcement so long as his pecuniary condition is very low, can seldom or never be a matter of indifference to the judgment-debtor; that even when capable of complete enforcement its moral effect will vary with the peculiar disposition of the defendant; and that the practical result is that the difference between the influence of such a judgment upon a person in a condition of insolvency and one in prosperous circumstances is only one of degree.

2. In Great Britain there is no such thing as what we understand by the term " organic law."   The king, lords, and commons of that country can, whenever so minded, effect any conceivable change in the institutions of the United Kingdom.   Hence, there is no fundamental or constitutional law in that country securing freedom of speech or of the press, though there is no land in which that freedom is practically more assured.   But not even in that

country, where the rigid restraints which bind our government do not exist, have any of its courts, since the abolition of the Court of Star Chamber, asserted the jurisdiction which the plaintiff invokes. When, in the hurry of a trial at *nisi prius*, an expression fell from the lips of the presiding judge, tending to the assertion of such a jurisdiction, or rather imagining such a jurisdiction to be vested in another court, the intimation, though plainly *obiter dictum*, alarmed the vigilance of the English Bar, and occasioned an unmistakable protest. In the case of *DuBost* v. *Beresford*, 2 Camp. N. P. 511, Lord Ellenborough, at *nisi prius*, let such an expression fall. This was in 1810, a time when Tory views of government were in the ascendant. In the edition of the State Trials, by Howell, in 1816 (vol. 20, note to p. 798), the learned and careful editor, annotating the case of *Rex* v. *Horne*, tried before Lord Mansfield in 1777, says: "Not unconnected with the law of libel, upon which Mr. Horne said so much in this case, is the *dictum* of Lord Ellenborough in the case of *DuBost* v. *Beresford*, 2 Camp. N. P. 511, being an action for destroying a picture which was publicly exhibited, but which was largely defamatory of a gentleman and his wife, who was defendant's sister." Lord Ellenborough ( C. J. B. R.) said: "If it was a libel upon the persons introduced into it, the law cannot consider it valuable as a picture. Upon an application to the lord chancellor he would have granted an injunction against its exhibition; and the plaintiff was, both civilly and criminally, liable for having exhibited it." "I have been informed by very high authority," proceeds Mr. Howell, "that the promulgation of this doctrine relating to the lord chancellor's injunction excited great astonishment in the minds of all the practitioners of the courts of equity, and I had apprehended that this must have happened, since I believe there is not to be found in the books any decision or any *dictum*, posterior to the days of the Star Chamber, from which such doctrine can be deduced either directly or

by inference or analogy; unless, indeed, we are to except the proceedings of Lord Ellenborough's predecessor, Scroggs, and his associates, in the case of Henry Case, in which case it was ordered that the book entitled 'The Weekly Packet of Advice from Rome, or the History of Popery,' be not further printed nor published by any person whomsoever." The case of Case is to be found in 7 Howell's State Trials, 4. That case was tried in 1680, in the reign of Charles II.; Scroggs, C. J., presided, and Jeffries prosecuted. This, it seems, furnished the only precedent, since the abolition of the Court of Star Chamber, on which Lord Ellenborough could have relied. The law as laid down in England by Lord Eldon, in *Gee* v. *Pritchard*, 2 Swans. 412-418, and by Lord Langdale, in *Clark* v. *Freeman*, 11 Beav. 112, and in New York by Chancellor Walworth, in *Brandreth* v. *Lance*, 8 Paige, 24, utterly repudiates the decision of Scroggs and the unguarded *dictum* of Ellenborough. The last authority is that of an American court, which treats almost contemptuously the suggestion that the publication of a libel may be enjoined. To the same effect see sec. 948 *a* of 2 Story's Com. on Eq. Jur., 11th ed.

No case is cited by the learned counsel for appellant in which the jurisdiction here claimed has been exercised. All that they venture to suggest is that the various English courts which have refused to exercise such a jurisdiction have placed their refusal on grounds which do not make such refusal certainly apposite to the circumstances shown by the petition. The refusal has been uniform. The reasons assigned for it have been various, according to the peculiarities of the cases in which they were given. To argue from the qualifications of so many concurring refusals that it may be inferred that, but for the qualifications, the refusals would not have been made, would be an exceedingly unsafe line of argument anywhere. In Missouri, where we are expressly forbidden by the Constitution to assume the

power we are asked by the plaintiff to exercise, our answer cannot be doubtful. It is hardly necessary to quote the familiar language of our organic law, which has always declared " that every person may freely speak, write, or print on any subject, being responsible for the abuse of that liberty."

If it be said that the right to speak, write, or print, thus secured to every one, cannot be construed to mean a license to wantonly injure another, and that by the jurisdiction claimed it is only suspended until it can be determined judicially whether the exercise of it in the particular case be allowable, our answer is that we have no power to suspend that right for a moment, or for any purpose. The sovereign power has forbidden any instrumentality of the government it has instituted to limit or restrain this right except by the fear of the penalty, civil or criminal, which may wait on abuse. The General Assembly can pass no law abridging the freedom of speech or of the press; it can only punish the licentious abuse of that freedom. Courts of justice can only administer the laws of the State, and, of course, can do nothing by way of judicial sentence which the General Assembly has no power to sanction. The matter is too plain for detailed illustration. The judgment of the Circuit Court is affirmed, all the judges concurring.