SIDNEY J. KWASS

*v.*

J. L. KERSEY

(No. 10622)

Submitted February 2, 1954. Decided March 16, 1954.

*J. W. Maxwell,* for appellant.

*Joseph M. Sanders,* for appellee.

LOVINS, JUDGE:

This is a suit brought by Sidney J. Kwass against J. L. Kersey in the Circuit Court of Mercer County.

Essentially, it is an injunction suit seeking to enjoin the defendant from defaming the plaintiff. There are special prayers touching alleged threats of assault and

attempted intimidation by the defendant against the plaintiff, and also concerning the damages allegedly suffered by the plaintiff from the defamatory words allegedly published by the defendant.

Upon the filing of the verified bill of complaint and a motion for a temporary injunction, the court granted a temporary injunction without notice.

The defendant, his agents, servants, employees and representatives were enjoined: (1) from circulating or publishing a certain letter addressed to Walter G. Burton, (2) from circulating or publishing any written or printed matter charging the plaintiff, expressly or impliedly, with fraud, conspiracy, deceit, dishonesty or unethical conduct "or any other wrong-doing", (3) from orally circulating or publishing charges of fraud, deception, conspiracy, dishonesty, unethical conduct, or any other wrong-doing, (4) from sending through the United States mails, or circulating or publishing in any manner whatsoever any written, printed or mimeographed letters, papers or documents, or from verbally making to any person or persons whatsoever, charges of unethical conduct, fraud, dishonesty, corruption, deception, or any other wrong-doing, (5) from making public or circulating any libelous or slanderous statements of any kind, character or description concerning the plaintiff, and (6) from interfering with, molesting, threatening, assaulting or attempting to intimidate the plaintiff.

After the award of a temporary injunction, the trial court entered a decree requiring the defendant to give a list of names and addresses of persons to whom copies of a letter, signed by the defendant and addressed to Walter G. Burton, was delivered or exhibited.

This suit grew out of the domestic troubles of the defendant's daughter, Josephine Kersey Campbell, with her husband, Alexander D. Campbell, who had signed an agreement concerning their property rights and marital difficulties.

The plaintiff drafted an agreement supplemental to and revising the first agreement, and according to the theory of the defendant, plaintiff induced his daughter, Mrs. Campbell, to sign the same. The defendant seems to think that Mrs. Campbell was deprived of substantial property rights, and the right to have custody of her three infant children.

The plaintiff denies that he represented Mrs. Campbell. The defendant, with equal vigor, asserts that the plaintiff was regarded as Mrs. Campbell's representative. In the course of negotiations, according to the charges made against the plaintiff, he advised Mrs. Campbell to go to Florida for the purpose of obtaining a divorce, and it seems that such effort was unsuccessful.

The instant suit was heard on the amended and supplemental bill of complaint, the demurrer of the defendant, Kersey, to such bill, which was overruled and the sworn answer of the defendant to such bill. The defendant thereupon moved the court to dissolve the injunction, which motion was overruled. This appeal followed.

A short synopsis of the salient facts alleged in the amended and supplemental bill of complaint discloses that the plaintiff is an attorney at law, residing in Bluefield; that he has a good reputation for honesty, integrity and ethical conduct; that he is wholly dependent for a livelihood upon the practice of his profession as an attorney at law; that he is a member of the Bar Association of his county and other organizations connected with the practice of the legal profession.

The plaintiff alleges that he represented Alexander D. Campbell and a corporation with which Campbell was connected for many years, prior to the institution of this suit; that at the request of said Alexander D. Campbell, he prepared a written contract between Campbell and his wife under date of July 1, 1950. By that agreement, Campbell agreed to transfer to his wife all of the furniture, fixtures and household goods then owned by Campbell and located in the family home at Bluefield, West Virginia,

and an automobile then owned by Campbell; that Mrs. Campbell should have custody of the three children, subject to "order of a court of competent jurisdiction and right of visitation by Mr. Campbell"; that Campbell should pay to his wife the sum of $75.00 per month for the support of each of said children until said children reached the age of 18 years; that he would pay his wife the sum of $125.00 per month; that Campbell would continue to pay monthly payments on the mortgage covering the family home, amounting to about $13,000.00, until the mortgage was satisfied; that he would maintain insurance on his life for the protection of his wife and children to the limit of his financial ability.

Plaintiff further alleges that Campbell advised him that Campbell's wife was dissatisfied with the provisions of the agreement; that she was tired of her duties as housekeeper and mother and desired to transfer those duties to her husband; and that it was her wish to leave Bluefield, "and make a life of her own at a place distant from Bluefield".

The plaintiff alleges that Campbell advised him that Josephine Kersey Campbell had agreed to the revision of the contract of July 1, 1950, in certain particulars, which revision was accordingly made by the plaintiff.

Under the revised agreement, Mrs. Campbell was to convey the Campbell home in the City of Bluefield to her husband. The Campbell home was worth approximately $16,500.00 at that time and was encumbered by a mortgage in the sum of $12,750.00. Campbell, in the revised agreement, was to pay his wife $200.00 for six months and if she was not gainfully employed, was to continue payment of $200.00 for a period of one year. Thereafter, the revised agreement provided that Campbell was to pay his wife $125.00 per month, as long as she lived or until she remarried, and if she remarried, he was to pay her $500.00 a year, and that he would maintain life insurance on his life for the benefit of his wife and three children.

The plaintiff further alleged that Campbell requested

him to prepare a supplemental agreement embodying the terms set forth above. The agreement was prepared and after two consultations, Campbell signed the agreement and informed the plaintiff that Josephine Kersey Campbell and her two brothers had inspected and approved the revised agreement.

On or about the 27th day of December, 1951, Campbell's wife went to the office of the plaintiff signed and acknowledged the supplemental agreement, with full knowledge and appreciation of its terms and conditions.

The plaintiff alleged in his bill that he read the agreement to her and fully discussed the revised agreement with her. Plaintiff alleged that he had good cause to believe from what Mrs. Campbell said to him that the revised agreement was acceptable to her; that at that time he suggested to Mrs. Campbell that she was free to discuss the agreement with other counsel; that if she did select such counsel that he would cause her husband to pay counsel fees involved in such consultations; but that Mrs. Campbell declined to consult another attorney and thereupon signed and acknowledged the revised agreement.

Plaintiff alleges that after the execution of the agreement, Mrs. Campbell and her father, the defendant, became dissatisfied with the revised agreement and without any justification, became very angry with the plaintiff and formulated a scheme to circulate as widely as possible among plaintiff's friends, associates and the public in general, false reports which were in substance that the plaintiff was "dishonest, unscrupulous, unethical, a 'shyster', a deceiver and betrayer of clients", and that the plaintiff should be disbarred as an attorney.

Plaintiff charges that Mrs. Campbell and the defendant, her father, entered into a conspiracy, having for its purpose the circulation of false reports concerning the plaintiff as a practicing attorney, for the object and purpose of destroying his reputation as a lawyer, and to cause prospective clients to believe that he was dishonest and to prevent him from being employed.

The plaintiff charges that pursuant to such arrangement between the defendant and his daughter, that they did circulate throughout Mercer County false reports, as above noted.

Plaintiff charges that the acts of the defendant and his daughter in the circulation of such reports have done him irreparable damage. Plaintiff also alleges that the defendant sent a letter to the plaintiff containing malicious falsehoods and statements of a scurrilous and defamatory nature. The plaintiff alleges that the defendant has exhibited copies of such letter to various persons and that doubt has been cast on his honesty and integrity; that a letter containing similar accusations, was sent to the Chairman of the Grievance Committee, West Virginia State Bar, Tenth District; that defendant has caused seventy-five copies of the letter addressed to such chairman to be mimeographed; and that in writing the letter and sending it to such chairman, the defendant was actuated by malice.

Plaintiff charges that the defendant has threatened bodily injury to him and also to have him disbarred from the practice of law. The plaintiff alleged that the defendant is not insolvent, but avers that he has not been employed for many years; that his financial resources are limited; that defendant would be unable to pay any substantial judgment if any should be rendered against him; that some of his prospective clients and friends believe the charges of defendant and his daughter are true; and that if the defendant is not restrained from carrying out his libelous and defamatory scheme, he will suffer great damages. The bill prays that the defendant be required to furnish the names and addresses of all persons to whom the letter sent to the Grievance Committee Chairman has been sent; that he be enjoined from further circulation of such letter, as well as further circulation of the letter sent to the plaintiff direct; that defendant be enjoined from publishing any written or printed matter, impliedly or expressly charging the plaintiff with "fraud, deception, conspiracy, unethical conduct or any other wrong-doing" in connection with the affairs of Josephine

Kersey Campbell; that defendant be enjoined from making oral charges of the nature noted above; that he be enjoined from sending any such printed or written matter through the mail; that the defendant be enjoined from making pubic or circulating any libelous or slanderous statements of any kind and concerning the plaintiff; and that defendant be enjoined from threatening or assaulting the plaintiff. Plaintiff also prays that the defendant be required to pay such damages as he, the plaintiff has incurred or will incur from the libelous and slanderous statements.

Plaintiff's Exhibit 1 is a copy of a letter dated March 3, 1952, and addressed to the plaintiff and evidently mailed by the defendant. In this letter the defendant accuses the plaintiff, Kwass, of bad faith in drafting the revised agreement and denounces the conduct of plaintiff in emphatic terms. Plaintiff is advised by the defendant in that letter that the Bar Association or Court would be requested to examine his conduct. A similar letter, addressed to Walter G. Burton, Chairman of the Grievance Committee of the West Virginia State Bar, Tenth District, dated February 14, 1953, in which the accusations hereinbefore detailed, were repeated, ending with a request that an inquiry be made and that the public in general be protected from unscrupulous practitioners.

The defendant demurred to the plaintiff's bill on six grounds, the substance of which is as follows: (1) That a court of equity has no jurisdiction, since the plaintiff has a plain, adequate and complete remedy at law, (2) that there is no allegation of contractual or trust relationship as between the defendant and the plaintiff, and that equity has no jurisdiction to enjoin the alleged libelous or slanderous statements, and particularly that equity has no jurisdiction to "enjoin the utterance of words or language tending to insults or violence or breach of peace", (3) that the alleged conspiracy or intimidation are colorable only; (4) that under Article 3, Sections 7 and 8 of the Constitution of West Virginia, and Code, 55-7-2, the trial and vindication of rights of defamatory utterances is limited to

actions at law and trial by jury, (5) that the granting of an injunction is in violation of Article III, Section 7, of the Constitution, as well as the first amendment of the Constitution of the United States for the reason it deprives the defendant of the right of freedom of speech, (6) that the allegedly libelous matter contained in the charges made to the Chairman of the State Bar Grievance Committee is privileged.

The demurrer was overruled. Thereupon, the defendant filed his answer. In it, the defendant denies any knowledge as to the standing of the plaintiff in the community. The defendant alleges that he is not fully informed concerning the representation of Alexander D. Campbell by the plaintiff or the corporation in which Campbell is interested.

The answer avers that Alexander D. Campbell is now the husband of Josephine Kersey Campbell and that Josephine Kersey Campbell is the daughter of this defendant. It is admitted by the defendant that his daughter and son-in-law were having domestic difficulties; that a written agreement had been prepared about January, 1950, between them and that said agreement was signed July 1, 1950; that Josephine Kersey Campbell employed the plaintiff to represent her in her difficulties with her husband.

The defendant avers upon information and belief that Josephine Kersey Campbell relied upon the plaintiff as her counsel, took his advice and that her employment of plaintiff contemplated a continuance of the relationship of at-. torney and client.

The defendant says that he is not informed as to whether Alexander D. Campbell advised the plaintiff that Josephine Kersey Campbell was dissatisfied with the provisions of the first contract of July 1, 1950, or as to any changes said Josephine Kersey Campbell desired to make in the first contract. Defendant however, says that if such representations were made by Alexander D. Campbell, that they were false. The defendant further answers and says that notwithstanding the relationship of attorney and

client existing between Josephine Kersey Campbell and the plaintiff in this suit, that the plaintiff never informed her that he was representing her husband, and that the plaintiff knew that she was relying upon him to represent her.

The defendant further says that the plaintiff, without informing Josephine Kersey Campbell that he was representing her husband in negotiating and drafting the revised agreement between Campbell and his wife, persisted in requesting Mrs. Campbell to sign the revised agreement. Defendant avers that his daughter did not go voluntarily to the office of the plaintiff, but went upon persistent requests of plaintiff and signed the revised agreement after being urged and importuned to do so by the plaintiff.

The defendant denies that the plaintiff suggested that his daughter confer with other counsel, but on the contrary, after executing said agreement, the plaintiff insisted that Josephine Kersey Campbell leave the City of Bluefield and go to the State of Florida, there to consult an attorney concerning the recovery of the custody of her children, as well as the recovery of her property.

The defendant avers that the plaintiff knew, or should have known that the Courts of Florida had no jurisdiction. But, notwithstanding this, the plaintiff arranged for Josephine Kersey Campbell to meet with him in the State of Florida and there employ counsel of plaintiff's selection.

Defendant says that he and his daughter were dissatisfied with the provisions of the revised contract and that the plaintiff urged Mrs. Campbell to conceal from her father the existence of this contract during its preparation and execution; that the daughter of this defendant completely relied upon the plaintiff as her attorney and did so conceal the contents of the revised agreement.

The defendant alleged that he was angered by the conduct of the plaintiff, but denies entering into a scheme with his daughter to circulate defamatory matter. The

defendant however avers that he did, upon learning the facts, conceive the idea of presenting a petition to the lawfully constituted authorities to inquire into the professional conduct of plaintiff, and that he did prepare and endeavor to file the same.

Defendant denies any unlawful combination or conspiracy existing between him and his daughter. He avers that he simply acted from his natural feelings toward his daughter, whom, he considered had been treated unfairly. Because of his devotion to her, he endeavored to have the plaintiff's fitness to practice law inquired into.

Defendant denies that he widely circulated any false or untrue statements concerning plaintiff, but alleged that he has assembled the facts as he understood them. He admits sending a letter to the plaintiff, adverted to in the plaintiff's bill of complaint, but he charges, upon information and belief, that the statements contained in such letter are true. He also admits that he wrote a letter to the Chairman of the Grievance Committee, West Virginia State Bar, Tenth District; that plaintiff's exhibit No. 2 is a true copy of that letter.

Defendant denies that he has threatened to inflict bodily injury or make any assault upon the person of the plaintiff, but says that it was his intention to present the facts contained in the letter to the Grievance Committee of the West Virginia State Bar.

Defendant says that he is not advised as to whether the plaintiff has sustained damages, irreparable or otherwise. Defendant denies that he is responsible for any injury to plaintiff because of his conduct as an attorney in handling the domestic difficulties between Campbell and his wife.

Pursuant to an interlocutory decree of the Circuit Court of Mercer County, the defendant furnished a list of the names and addresses of the persons to whom he had sent the copies of the letters mentioned above. The trial court, on July 8, 1953, overruled a motion to dissolve the temporary injunction.

The threshold question is: Does a court of equity have jurisdiction to enjoin the publication of defamatory statements, oral or written?

Other subsidiary questions are: (a) Does the plaintiff have an adequate and complete remedy at law? (b) Should the alleged defamation of the plaintiff's professional standing be enjoined?

This suit presents a question which is of first impression in this jurisdiction. In fact, we have found no cases decided by this Court or the Supreme Court of Virginia, prior to 1863. "Equity has no jurisdiction when there is a full, complete remedy at law." *McGhee* v. *Stevens,* 121 W. Va. 430, 3 S. E. 2d 615; *Lewis* v. *Hall,* 64 W. Va. 147, 61 S. E. 317; *Coombs* v. *Shisler,* 47 W. Va. 373, 34 S. E. 763; *Michael* v. *Workman,* 5 W. Va. 391.

"Bearing in mind the infamous history of the Star Chamber, it must be remembered that the subject matter of equity jurisdiction is the protection of civil rights and private property and not the prevention of crime or immoral acts when not in connection with violation of private rights. An injunction will not lie for the prevention of a crime or illegal or immoral act merely because of its illegality. One reason for noninterference in such case is the fundamental want of jurisdiction; another is the existence of an adequate remedy at law." 10 M. J., Injunctions, §10. See *Crossland* v. *Crossland,* 53 W. Va. 108, 44 S. E. 424; *State* v. *Ehrlick,* 65 W. Va. 700, 64 S. E. 925; *Ocean City Association* v. *Schurch,* 57 N. J. Equity Reports, 268.

Jurisdiction of actions to award damages for defamation, written or spoken, is a well known function of courts of law in this jurisdiction. *Sweeney* v. *Baker et al.,* 13 W. Va. 158.

It is a crime to use insulting words while on the enclosed lands of another to one lawfully on such lands. Code, 61-3-33.

The common law crime of defamation is still recognized in this jurisdiction. *State* v. *Payne,* 87 W. Va. 102, 104 S. E.

288; *State* v. *Clifford,* 58 W. Va. 681, 52 S. E. 864; *State* v. *Aler,* 39 W. Va. 549, 20 S. E. 585.

The plaintiff in this suit has an adequate remedy at law: By action for damages, and as an added deterrent, a prosecution for the defamation by criminal prosecution. *Citizens' Light, H. & P. Co.* v. *Montgomery Light & W. P. Co.,* 171 Fed. 553.

We do not, however, express any opinion on the merits of a proceeding at law in either aspect.

It is a rule of general application in the United States that equity will not enjoin the publication of defamatory matter in the absence of a contractual or trust relation. An early case announcing that principle is *Brandreth* v. *Lance,* 8 New York Chancery Reports, 24 Paige, 8, decided in 1839. Headnotes of that case are as follows: "The court of chancery has not jurisdiction to restrain the publication of a libel, by injunction, upon a bill filed by the party whose character or business will be injured by the publication. An injunction to restrain a publication can only be granted in cases where the publication will interfere with the complainant's right either of literary or other property in the subject matter of the publication."

In the course of the opinion in *Brandreth* v. *Lance, supra,* the court uses the following language: "This bill presents the simple case of an application to the court of chancery to restrain the publication of a pamphlet which purports to be a literary work, undoubtedly a tale of fiction, on the ground that it is intended as a libel upon the complainant. The court of star chamber in England, once exercised the power of cutting off the ears, branding the foreheads, and slitting the noses of the libellers of important personages. (Hudson's Star Chamber, 2 Collect. Jurid. 224.) And, as an incident to such a jurisdiction, that court was undoubtedly in the habit of restraining the publication of such libels by injunction. Since that court was abolished, however, I believe there is but one case upon record in which any court, either in this country or in England, has attempted, by an injunction or order of the court, to prohibit

or restrain the publication of a libel, as such, in anticipation. In the case to which I allude the notorious Scroggs, chief justice of the court of king's bench, and his associates, decided that they might be safely entrusted with the power of prohibiting and suppressing such publications as they might deem to be libellous." The House of Commons of the Parliament of Great Britain impeached Scroggs for the exercise of such power.

"* * * where no breach of trust or of contract appears, a bill in equity will not lie to enjoin the publication of libelous statements injurious to the plaintiff's business, trade or profession, or which operate as a slander of his title to property." *Finish Temperance Society Sovittaja* v. *Riavaaja Pub. Co. et al.,* (Mass.) 106 N. E. 561; *Raymond* v. *Russell,* (Mass.) 58 Am. Rep. 137. See *Choate* v. *Logan,* (Mass.) 133 N. E. 582; *Lawrence Trust Co.* v. *Sun-American Pub. Co.,* (Mass.) 139 N. E. 655; *Boston Diatite Company* v. *Florence Manufacturing Company,* (Mass.) 19 Am. Rep. 310.

The Supreme Judicial Court of Massachusetts has receded somewhat from the doctrine immediately stated above. See the case of *Menard* v. *Houle,* (Mass.) 11 N. E. 2d 436, wherein it was held: "Where there is a continuing cause of unjustified and wrongful attack on a business man motivated by actual malice and causing damage to property rights as distinguished from injury to the personality affecting feelings, sensibility, and honor, equity will take jurisdiction, even though false statements and announcements are the means employed, and conspiracy or unfair competition does not appear, since there is no adequate remedy at law."

The cases of *Brandreth* v. *Lance, supra,* and *Finish Temperance Society Sovittaja* v. *Riavaaja Pub. Co. et al., supra,* are in harmony with the principle enunciated by the Supreme Court of the United States. In *Francis* v. *Flinn,* 118 U. S. 165, 30 S. Ct. 385, 30 Law Ed. 386, wherein the following language is used: "The whole gist of the complaint is that the defendants do not treat the plaintiff as having a right to use his vessel as a pilot boat, and have

publicly so stated, and that some of the parties mentioned have been subjected to suits for their acts in piloting. But if this be so, the plaintiff has a full remedy for his alleged wrongs in the courts of law. They furnish no ground for the interposition of a court of equity." The decree of the lower court was reversed and the bill dismissed. A similar rule is enunciated by other courts of the United States. In *Kidd* v. *Horry,* 28 Fed. Rep. 773, it was held that the United States Courts are without jurisdiction to restrain the publication of libel. The following language used in the opinion is informative: "But neither the statute law of this country, nor any well-considered judgment of the courts, has introduced this new branch of equity, into our jurisprudence. There may be a case or two looking that way, but none that we deem of sufficient authority to justify us in assuming the jurisdiction." See *Edison* v. *Thomas A. Edison, Jr., Chemical Co.,* 128 Fed. 957; *Black & Yates* v. *Mahogany Ass'n.,* 129 Fed. 2d 227; *Toledo Computing Scale Co.* v. *Computing Scale Co.* (6 C. C. A.) 142 Fed. 919; *American Malting Co.* v. *Keitel* (2 C. C. A.) 209 Fed. 351; *Oil Conservation Engineering Co.* v. *Brooks E. Co.* (6 C. C. A.) 52 Fed. 2d 783; *Dayton* v. *McGranery* (U. S. C. A. Dist. of Col.) 201 Fed. 2d 711; *Kuhn* v. *Warner Bros. Pictures* (Dist. Ct., S. D. N. Y.) 29 Fed. Supp. 800.

A decision of the District Court of the Eastern District of Tennessee in the case of *Starns* v. *Success Portrait Co.,* 28 Fed. Supp. 711, is to the effect that equity has no jurisdiction to enjoin the utterance of slander or the writing of libel, but if the "slander or libel is in bad faith, for the sole purpose of injuring the trade of the person defamed", an injunction may issue.

The case of *Carter* v. *Knapp Motor Co.,* (Ala.) 11 So. 2d 383, embodies a principle similar to that announced by the Massachussetts Court in *Menard* v. *Houle, supra.* In the *Carter* case, it was held the conduct of the defendant was injurious and that an adequate remedy at law did not exist and that plaintiff was entitled to an injunction.

There is a line of cases, principally in the midwestern

states which deny an injunction to restrain the publication of defamatory matter. See *Life Assn. of America* v. *Boogher,* 3 Mo. Appeal Rep. 173; *Wolf* v. *Harris* (Mo.) 184 S. W. 1139; *Marx & Haas Jeans Clothing Co.* v. *Watson* (Mo.) 67 S. W. 391; *Howell* v. *Bee Pub. Co.* (Neb.) 158 N. W. 358. See *Montgomery Ward & Co.* v. *South Dakota R. M. & H. D. Ass'n.* 150 Fed. 413.

The Supreme Courts of Missouri and Nebraska rest their decisions upon a constitutional provision, reading in substance as follows: " 'Every person may freely speak, write and publish on all subjects, being responsible for the abuse of that liberty; and in all trials for libel, both civil and criminal, the truth when published with good motives, and for justifiable ends, shall be a sufficient defense.' " Under a similar provision of the constitution, it was held in the case of *The New York Juvenile Guardian Society* v. *Roosevelt,* 7 Daly's Reports 188, that a court of equity was without jurisdiction to restrain publication of libelous matter.

Other jurisdictions however, without relying on such constitutional provisions above noted, have held that an injunction to restrain the publication of defamatory matter may not issue. In one instance, it was held that an injunction performing that function, awarded by a trial court, was an absolute nullity. *State ex rel. Liversey et al.* v. *Judge Civil District Court,* 34 La. Annual Rep. 741. See *McMorries* v. *Hudson Sales Corp.* (Texas) 233 S. W. 2d 938. *Marlin Firearms Co.* v. *Shields,* (N. Y.) 64 N. E. 163, is likewise authority for the proposition that injunction does not lie even though the manufacturer of a disparaged article has no remedy at law. The reasons assigned is that no special damages were shown. It is a rule of general application that in the absence of statute, equity has no jurisdiction to enjoin publication of defamatory matter, if no breach of trust or contract is involved. 43 C. J. S. Injunctions, §134.

"Although not a universal rule, it is one frequently acceded to and followed that in the absence of a showing of violation of some property right, or some breach of

trust or contract, injunction is not available to prevent actual or threatened publications of a defamatory character, or to compel the retraction of such publications, at least if no property right is infringed." 28 Am. Jur., Injunctions, §118.

In 2 High on Injunctions, Fourth Edition, §1015, the following language is used: "Upon the question of preventive relief in equity against the publication of libelous statements, affecting the character or business of plaintiff, the authorities, both English and American, indicate a noticeable want of uniformity, and are, indeed, wholly irreconcilable. The earlier English doctrine, and that which seems most in accord with the principles governing the jurisdiction of equity by way of injunction, was that the preventive jurisdiction being limited to the protection of property rights which are remediless by the usual course of procedure at law, courts of equity would not restrain the publication of libels or works of a libelous nature, even though such publications were calculated to injure the credit, business, or character of the person aggrieved, and that he would be left to pursue his remedy at law." See Section 1093, *id.* In Newall Slander and Libel, Fourth Edition, §198, the following language is found: "The general rule in America is, and in England was, at least before the Common Law Procedure Act of 1854, that an injunction could not be issued to restrain a libel." Citing *Brandreth* v. *Lance, supra,* and *The New York Juvenile Guardian Society* v. *Roosevelt, supra.*

Indeed, we have found no authority in the United States which holds that mere defamation can be enjoined. In some instances, as herein stated, Courts have enjoined it for the reason that it was connected with disparagement of tangible property generally for sale or manufactured by the defendant. See *Weiss* v. *Levine,* (N. J. Chancery) 32 A. 2d 574; *Esskay Art Gallaries* v. *Gibbs,* (Ark.) 172 S. E. 2d 924; Pomeroy's Equity Jurisprudence, Third Ed. §1358; XVIII A. and E. Encyclopaedia of Law, Libel and Slander, §XV et. seq.

The same rule prevailed in England, but since the adop-

tion of the Common Law Procedure Act of 1854 and the Judicature Act of 1873 by that country, jurisdiction to grant interlocutory injunctions enforcing libel and slander has been assumed.

An excellent article which argues eloquently that courts of equity should have jurisdiction to grant injunctions of the kind here discussed, written by Dean Roscoe Pound, will be found in 29 Harvard Law Review at page 640. Essentially, the article by Dean Pound is in part a criticism of the finding of Lord Eldon in the case of *Gee* v. *Pritchard,* 2 Swans. 402, 36 English Reports Reprint 670. It is argued that the findings of Lord Eldon in the case of *Gee* v. *Pritchard, supra,* is dictum; and that it should be the law that equity has jurisdiction to enjoin the publication of libel and slander. While the article by Dean Pound is very persuasive, we do not agree with the conclusion expressed therein.

Thus far, we have cited authorities of general application. The case of *Gariepy* v. *Springer,* (Ill. App.) 48 N. E. 2d 572, is in point with the case at bar. In the *Gariepy* case, the plaintiff sought and obtained an injunction in the trial court, enjoining alleged defamatory matter which had been allegedly published in derrogation of the plaintiff's standing as a lawyer. The court held that equity, as a general proposition, would not enjoin the publication of defamatory matter, injuring the person's credit and business standing. The second headnote in the *Gariepy* case reads as follows: "Equity is without jurisdiction to restrain publication of a libel except in cases involving conspiracy, intimidation, or coercion."

There is no proof in this record of the allegations in the bill of complaint charging conspiracy against the plaintiff, of intimidation or coercion employed against him. True, conspiracy, intimidation and coercion are alleged, but such allegations are denied by the defendant's answer.

A similar holding to that in the *Gariepy* case will be found in the case of *Lietzman* v. *Radio Broadcasting Sta-*

*tion W. C. F. L.* 282 Ill. App. 203. In the *Lietzman* case, a corporation was the plaintiff, the corporation being a practitioner of dentistry.

If a right of trial by jury existed prior to the adoption of the constitution, the legislature cannot legally extend equity jurisdiction to such cases and thus deprive a litigant of a jury trial against his will. *Lawhead* v. *Grand Lodge*, 115 W. Va. 475, 176 S. E. 860; *Cecil et al.* v. *Clark et al.*, 44 W. Va. 457, 30 S. E. 178. But, if at the time equity had jurisdiction in certain litigation, the clause of our constitution guaranteeing jury trial does not apply to such litigation or deprive equity of jurisdiction therein to act without a jury. *Cecil et al.* v. *Clark et al., supra.*

Adverting again to the question of enjoining interference with property rights, we are aware that in *Sloan* v. *Mitchell*, 113 W. Va. 506, 168 S. E. 800, it was held that the right to practice medicine was a valuable property right and the unauthorized practice of medicine by Mitchell, the defendant, was enjoined. Similarly, it has been held that the right to practice law is a property right. *Unger* v. *Landlords' Management Corporation* (N. J.) 168 A. 229; *Fitchette* v. *Taylor* (Minn.) 254 N. W. 910; *Montgomery County Bar* v. *Rinalducci* (Pa.) 197 A. 924.

The property right in the practice of a profession is *ex necessitate,* an intangible property, connected with the personality of a practitioner of such profession.

Many courts have distinguished between a continuing "trade libel" and defamation of personality. *Black & Yates* v. *Mahogany Ass'n., supra.* Such distinction seems to be part of the reason for the decisions in *Menard* v. *Houle, supra,* and *Carter* v. *Knapp Motor Company, supra.*

In the instant case, the suit is based on alleged defamation of plaintiff as a lawyer. The personality of the plaintiff and his professional standing as a lawyer cannot be separated on a rational basis. Since there is no defamation of tangible personal property alleged or shown in this record, we do not think that any question of defama-

tion or disparagement of tangible personal property can be here considered.

Our attention has been directed to Article III, Section 7, Constitution of West Virginia, which reads as follows: "No law abridging the freedom of speech, or of the press, shall be passed; but the Legislature may by suitable penalties, restrain the publication or sale of obscene books, papers, or pictures, and provide for the punishment of libel, and defamation of character, and for the recovery, in civil actions, by the aggrieved party, of suitable damages for such libel, or defamation."

In considering this part of our constitution, it was inferentially held in the case of *Bailey* v. *Charleston Mail Association,* 126 W. Va. 252, 27 S. E. 2d 837, that no special privilege or right is conferred thereby relative to the law of defamation, by that provision. "No case has been found in which any court, state or federal, has held that the communication or dissemination of falsehoods or of malicious statements by speech, press or otherwise is protected by any constitutional guaranty." *Blossom Dairy Co.* v. *International Brotherhood, Etc.,* 125 W. Va. 165, 23 S. E. 2d 645, 650. See 16 C. J. S. Constitutional Law, Section 215-e. But since we express no opinion on the merits of plaintiff's cause of action, if any, we should not discuss further the question of freedom of speech, nor the question of whether the letter to the Chairman of the Grievance Committee of the West Virginia State Bar, Tenth District, is absolutely or qualifiedly privileged.

Section 8 of Article III of our Constitution, reads as follows: "In prosecutions and civil suits for libel, the truth may be given in evidence; and if it shall appear to the jury, that the matter charged as libelous, is true, and was published with good motives, and for justifiable ends, the verdict shall be for the defendant." This provision of our Constitution, at least by implication, indicates that a jury should pass upon the truth or falsity of allegedly defamatory matter.

Code, 55-7-2, dealing with insulting words, indicates

that an intervention of a jury is necessary in passing thereon. We therefore refrain from passing on the truthfulness or falsity of the allegedly defamatory matter set forth in the plaintiff's bill of complaint.

In accordance with the foregoing, we hold that the cause of action, if any, possessed by the plaintiff, was brought in the wrong forum and should have been instituted on the law side of the court.

Agreeable to the foregoing, the decree of the Circuit Court of Mercer County is reversed, the temporary injunction is dissolved and the bill of complaint is dismissed.

*Reversed;*
*temporary injunction dissolved;*
*bill of complaint dismissed.*

GIVEN, PRESIDENT, dissenting:

Being of the view that the Court has fallen into grievous error in treating this case of first impression in this State as involving nothing more than libel or slander, I believe it necessary, in order to fully understand the questions involved, to point out definitely some of the pertinent allegations of the amended and supplemental bill of complaint.

After certain formal allegations, plaintiff charges that defendant and his daughter, "without any justification or excuse whatever, became angry, infuriated and enraged at plaintiff and thereupon conceived and formulated a scheme and plan to circulate as widely as possible among plaintiff's clients, friends, associates and the public generally throughout Mercer County, West Virginia, false reports, both verbal and written, to the effect that plaintiff as a practicing attorney was dishonest, unscrupulous, unethical, a 'shyster', a deceiver and betrayer of clients * * * with the * * * object and purpose of intimidating and coercing plaintiff to such an extent that he, plaintiff, would not appear as a witness" in a certain chancery cause in which the defendant and his daughter were interested; that in January or February, 1952, in Mercer

County, defendant and his daughter "* * * entered into an unlawful combination, plan and conspiracy, with the understanding and agreement that they would combine together and through their concerted efforts and with a common purpose and design that they would circulate said false reports concerning plaintiff as a practicing attorney for the object and purpose and with the intention of destroying the plaintiff's reputation as a lawyer and destroying plaintiff's law practice, of coercing and intimidating the plaintiff as aforesaid * * *"; and that the defendant and his daughter "have threatened to continue to circulate said reports indefinitely, and that they will do so unless enjoined * * *"; that pursuant to the unlawful conspiracy, defendant and his daughter "began circulating as widely as possible throughout Mercer County, West Virginia, false reports to the effect that plaintiff was ignorant, dishonest, unscrupulous, unethical, 'shyster', a robber, a deceiver and betrayer of clients and * * * have continued to circulate said false report and have threatened, and expect, to continue to circulate said false reports so long as they are permitted to do so; that said false reports have spread widely and with great rapidity * * * causing plaintiff incalcuable and irreparable damage * * *"; and that defendant and his daughter "have threatened and intend to continue said defamation with the malicious purpose of destroying * * * the plaintiff's law practice * * *". Plaintiff further charges, on information and belief, "that defendant's financial resources are very limited", and that plaintiff has suffered "great and irreparable damage and injury" and will continue to suffer damages unless defendant is enjoined from further circulating such false reports.

A letter filed with and made part of the amended and supplemental bill, written to plaintiff by defendant, copies of which are alleged to have been circulated widely in Mercer County, charges plaintiff with having fraudulently induced defendant's daughter to execute certain documents; with "Double-Cross"; that plaintiff "conceived with fraudulent intent, to deceive Josephine Campbell, the purpose of which was to break up her home, de-

prive her of her children, deprive her of her home, and to lastly drive her away from her family and friends"; and that "The next activity on your part, you had cunningly concealed the deadly claws of your legally trained mind like a beast of prey, and had lured her to Florida seeking relief from the horrible crime you had done her". Numerous other scurrilous statements are contained in the letter, but enough has been pointed out, we believe, to indicate the general nature of the accusations. The prayer is for injunctive relief and for damages.

Defendant demurred to and answered the amended and supplemental bill. The answer denied any malice, the formation of any conspiracy, and any threat to do bodily injury to plaintiff. As to the greater number of material allegations, defendant simply alleges that he has no information, or is not advised, as to the truth thereof. Some of the material allegations of the bill are admitted to be true. The writing and publication are not denied. Defendant also alleges in his answer that his daughter employed plaintiff to represent her in her domestic difficulties and that plaintiff accepted such employment, notwithstanding he was then acting as attorney for the husband of the daughter in the same domestic difficulties. It was during the time of the alleged attorney-client relationship, and growing out of it, that the improper acts on the part of plaintiff are alleged by defendant to have occurred. Plaintiff contends that the trust relationship of attorney and client never existed; that he, in fact, represented only the husband of the daughter of defendant; and that that fact was at all times known to the daughter.

The decree complained of was an interlocutory decree, entered upon the hearing of defendant's demurrer to the amended and supplemental bill, and on motion to dissolve the temporary injunction, the decree being appealable to this Court only by virtue of a special statute, Code, 58-5-1. Plaintiff has had no opportunity to produce proof upon the merits of the cause. Upon the demurrer, as pointed out in the opinion of the trial court, made part of the record, the allegations of the bill "must be treated as

true on this demurrer". The trial court also pointed out in that opinion that "The defendant cannot be prejudiced by the continuance of the temporary injunction until final hearing. However, the plaintiff may suffer irreparable injury by the dissolution of the injunction." Of course, if there is no equity in the bill, or equity has no jurisdiction, the dissolution of the temporary injunction should have been decreed. Coupled with the hearing on the demurrer was a hearing on the motion to dissolve the temporary injunction. As stated in the opinion of the trial court, however, "In the instant case the answer does not deny all of the material allegations of the bill. In fact, the answer admits the writing and the publication of the alleged defamatory letters, but in effect confesses and avoids, and says that the facts stated in the letters are true on information and belief". In this situation, if equity had jurisdiction of the suit, the matter of dissolving the temporary injunction would be within the discretion of the trial court. In *Kessel* v. *Cohen,* 104 W. Va. 296, 140 S. E. 15, this Court held: "2. The dissolution of an injunction is a matter of sound judicial discretion, and the appellate court will not disturb the decree of the lower court dissolving or refusing to dissolve, where it appears that the discretion has been soundly exercised, or where the contrary does not appear in the record." See *Huffman* v. *Chedester,* 126 W. Va. 73, 27 S. E. 2d 272; *City of Huntington* v. *Greene Line Terminal Company,* 126 W. Va. 463, 28 S. E. 2d 905; *State* v. *Navy,* 123 W. Va. 722, 17 S. E. 2d 626; *Grobe* v. *Roup,* 46 W. Va. 488, 33 S. E. 261.

Though I am of the opinion that equity should, in some circumstances at least, take jurisdiction for the purpose of restraining "publication of defamatory statements relating to personality and professional conduct", I do not propose to attempt to discuss that question here, for the simple reason that, in my view, the facts of this case make it something more than defamation of personality and professional conduct. Some of the reasons for my belief will appear later in this dissent, in the discussion of questions relating to whether plaintiff has an adequate remedy

at law. The question, however, is of great interest and of great importance, and has been fully considered in an article by Dean Roscoe Pound, titled Equitable Relief Against Defamation and Injuries to Personality, 29 Harvard Law Review 640, mentioned in the majority opinion.

Considering the allegations of the amended and supplemental bill of complaint as true, as indeed we must on demurrer, it seems clear that, in addition to alleging defamation of personality and professional conduct, the bill alleges a conspiracy to destroy plaintiff's law business; an effort on the part of defendant to intimidate plaintiff as a witness in a court proceeding in which defendant is interested; an attempt by defendant to coerce plaintiff not to testify in such proceeding; that defendant has published false and malicious reports against plaintiff over a considerable period of time; that defendant has threatened to continue indefinitely the publication of such false and malicious reports; and that defendant has made threats to do plaintiff bodily harm. The majority opinion admits that "conspiracy, intimidation and coercion are alleged". Also, considering the letters made part of the bill, it is clear that defendant has charged plaintiff with having in numerous ways violated a trust created by the relationship of attorney and client, which defendant contends existed between plaintiff and defendant's daughter. A false charge that it did exist, coupled with a false charge of the breach thereof, would be as objectionable, if not more so, as a mere breach of that trust relationship. It must be kept in mind that the amended and supplemental bill was duly verified.

In the early development of the law of defamation, it would seem that courts of equity usually denied preventive relief, even where property rights were involved, on the theory that the person injured had an adequate remedy at law. Some courts still adhere to that theory. The English Courts have long since abandoned the ancient doctrine. Undoubtedly, the modern trend of courts in this country is to grant preventive relief in such cases, especially if in addition to mere charges of slander or

libel there are involved charges of conspiracy, malice, coercion, intimidation, threats of continued publication of false statements, breach of trust, breach of contract or threats to do bodily harm. The rule is stated in 43 C. J. S., Injunctions, Section 135: "Subject to some exceptions, the rule according to most authorities is that equity will not exercise its jurisdiction for injunctive relief against a slander or libel where business or property rights are affected thereby, in the absence of acts of conspiracy, intimidation, or coercion, or where no breach of trust or of contract appears." Notice the exceptions of conspiracy, intimidation, coercion, breach of trust, and breach of contract. In 28 Am. Jur., Injunctions, Section 116, after considering the general rule, this statement is made: "* * * But equity will interfere by injunction in every other case where it is necessary to prevent wrongful acts resulting in loss of health, loss of trade, destruction of the means of subsistence, or permanent ruin to property * * * with business, trade, or occupation, or with other property rights * * *". In 28 Am. Jur., Injunctions, Section 118, this statement is found: "* * * Thus, if the libelous publication is to be repeated and continued indefinitely, equity may act on the ground of the inadequacy of a legal remedy to prevent a multiplicity of suits."

In *Menard* v. *Houle,* 298 Mass. 546, 11 N. E. 2d 436, the Court held: "2. Where there is a continuing cause of unjustified and wrongful attack on a business man motivated by actual malice and causing damage to property rights as distinguished from injury to the personality affecting feelings, sensibility, and honor, equity will take jurisdiction, even though false statements and announcements are the means employed, and conspiracy or unfair competition does not appear, since there is no adequate remedy at law." In *Carter* v. *Knapp Motor Co., Inc.,* 243 Ala. 600, 11 So. 2d 383, 144 A. L. R. 1177, the Court held: "1. The right to conduct one's business without wrongful interference and to enjoy good name and good will of business are valuable 'property rights' and will be protected by injunctive process if necessary." "2. One's employment,

trade or calling is a 'property right', the wrongful interference with which is an actionable wrong."

In *McMorries* v. *Hudson Sales Corp.* (Tex. Civ. App.), 233 S. W. 2d 938, the Court held: "1. Equity does not intervene to restrain the publication of words on a mere showing of their falsity, but only intervenes in those cases where restraint becomes an essential to preservation of business or other property interest threatened with impairment by illegal combination or by other tortuous acts."

In *Unger* v. *Landlords' Management Corporation*, 114 N. J. Eq. 68, 168 A. 229, the Court held: "2. Right to practice law is 'property right' existing by virtue of license, of letters patent, from state as sovereign, which may be protected from unlawful encroachment, threatening irreparable damage, by injunction."

In *Gariepy* v. *Springer*, 318 Ill. App. 523, 48 N. E. 2d 572, upon which the majority relies heavily, the Court held: "3. Where there was no proof of any threat by defendant to continue to publish libelous matter concerning attorney, as defendant allegedly had previously done, and there was no conspiracy, intimidation, or coercion involved, an injunction would not lie to restrain continued publication." Notice particularly the exceptions to the general rule pointed out by the Court.

In *Cook* v. *John H. Mathis Co.*, 1 N. J. Super. 335, 61 A. 2d 585, the Court held: "1. Right of an individual to work at his chosen trade or profession is a property right, and court of equity will protect that right from unlawful interference by others."

For other authorities in accord with the holding that equity has jurisdiction to protect property rights by injunction and, in some circumstances, personal rights, see *Lawrence Trust Co.* v. *Sun-American Pub. Co.*, 245 Mass. 262, 139 N. E. 655; *Davis* v. *New England Ry. Pub. Co.*, 203 Mass. 470, 89 N. E. 565; *J. C. Pitman & Sons* v. *Pitman*, 29 Del. Ch. 189, 47 A. 2d 721; *Burke Transit Co.* v. *Queen City Coach Company*, 228 N. C. 768, 47 S. E. 2d 297; *Vanderbilt*

*v. Mitchell,* 72 N. J. Eq. 910, 67 A. 97, 14 L. R. A., N. S., 304; *Black & Yates* v. *Mahogany Ass'n.,* 129 F. 2d 227, 148 A. L. R. 841; *Pearce* v. *Pearce,* 37 Wash. 2d 918, 226 P. 895; *Starns* v. *Success Portrait Co.,* 28 F. Supp. 711; *Lietzman* v. *Radio Broadcasting Station W. C. F. L.,* 282 Ill. App. 203; Equitable Relief Against Defamation and Injuries to Personality, 29 Harvard Law Review 640; Restatement of the Law of Torts, Section 942; Annotation 148 A. L. R. 860; Injunctions, Restraining Unlicensed Practice of Medicine, 40 W. Va. Law Review 87.

It seems clear to me that until the decision in the instant case, this Court has always moved toward the advanced view in approaching the question involved. Thus, in *Buskirk* v. *Sanders,* 70 W. Va. 363, 73 S. E. 937, the Court held: "2. The mere existence of a legal remedy is not of itself sufficient ground for refusing relief in equity by injunction; nor does the existence or non-existence of a remedy at law afford a test as to the right to relief in equity. It must also appear that it is as practical and efficient to secure the ends of justice and its prompt administration as the remedy in equity." "3. Though defendant has legal and equitable defenses he has the right as a general rule to go into a forum where he may have the benefit of all his defenses, and thereby be afforded complete protection against the claims of his adversary." See *Consumers Gas Utility Company* v. *Wright,* 130 W. Va. 508, 44 S. E. 2d 584; *Blossom Dairy Company* v. *International Brotherhood of Teamsters,* 125 W. Va. 165, 23 S. E. 2d 645; *Sloan* v. *Mitchell,* 113 W. Va. 506, 168 S. E. 800; *National Woolen Mills* v. *Local No. 350 of Journeymen Tailors Union,* 100 W. Va. 627, 131 S. E. 357; *Parker Paint and Wall Paper Co.* v. *Local Union No. 813,* 87 W. Va. 631, 105 S. E. 911. In the *Parker Paint and Wall Paper Co.* case, this Court held: "2. Where a person or combination of persons seeks to destroy another's trade or business and by their actions influence or intimidate others with whom he has valuable contracts, causing said others to break such contracts and discharge his employees then actually performing the same, and the loss is actual, continuing and irreparable, injunction will lie to compel such

person or combination of persons to desist from such acts."

It now appears well settled that the right to practice law, the profession of law, or the established clientele of a lawyer, within the meaning of the cases cited, is "property" which may be protected by preventive relief. In *Montgomery County Bar Ass'n v. Rinalducci*, 329 Pa. 296, 197 A. 924, the Court held: "2. The right to practice law is a 'property right' as respects whether attorney in disbarment proceedings was denied a substantive right because proceedings were not initiated by the court and judges did not personally hear all the evidence." See *Unger v. Landlords' Management Corporation, supra; Fitchette v. Taylor*, 191 Minn. 582, 254 N. W. 910.

In *Sloan v. Mitchell*, 113 W. Va. 506, 168 S. E. 800, this Court held: "1. The right of a licensed physician and surgeon to practice his profession is a valuable franchise in the nature of a property right to protect which he may sue in equity in the interest of himself and other physicians similarly situated, to enjoin a person from encroaching upon said right by engaging in the practice of medicine and surgery without a state license." "2. A court is not powerless to prevent the doing of an act involving encroachment upon valuable franchise rights of others merely because such conduct is denounced as a public offense. *State v. Lindsay*, (Kan.) 116 Pac. 207." A large number of cases are cited in the opinion supporting the holdings. See *West Virginia State Medical Association v. Public Health Council*, 125 W. Va. 152, 23 S. E. 2d 609.

In addition to the jurisdictional facts discussed above, equity should grant preventive relief in the instant case for two further reasons: The plaintiff has no adequate remedy at law, and the granting of the relief prayed for in the bill would avoid a multiplicity of suits. As I understand the majority opinion, it is to the effect that if either of such grounds exists, equity may take jurisdiction. Citing further authorities would not be helpful, especially in view of the holdings pointed out above.

In *Buskirk v. Sanders, supra,* in the points of the sylla-

bus quoted above, the Court held that to constitute an adequate remedy which would preclude a court of equity from exercising jurisdiction, the legal remedy must be "as practical and efficient to secure the ends of justice and its prompt administration as the remedy in equity". In the opinion, the Court pointed out: "Though one have a defense at law, yet if it be doubtful, and he also have equitable defenses, and his legal defense would not be as adequate and certain as in a court of equity, he may go into equity, at once, without awaiting the result of the lawsuit, or even being compelled to confess judgment at law. *Gas Co.* v. *Window Glass Co.*, 63 W. Va. 266; *Eastern Oil Co.* v. *Coulehan*, 65 W. Va. 531. 'If any affirmative equitable relief is necessary to a full settlement of the controversy, and to a complete protection of defendant's rights, a court of equity will interfere, and entertain a suit for such relief, and enjoin the action at law.' 4 Pom. Eq. Jur., section 1363, page 2706; 22 Cyc. 799, 801, and cases cited; *Knott* v. *Seamands*, 25 W. Va. 99, 105; *Dudley* v. *Miner's Ex'or*, 93 Va. 408, 25 S. E. 100, 101; High on Injunctions, (4th Ed.) sections 30, 66. The mere existence of a legal remedy, says Mr. High, section 30, 'is not in itself sufficient ground for refusing relief in equity by injunction; nor does the existence or non-existence of a remedy at law afford a test as to the right to relief in equity. * * * It must also appear * * * that it is as practical and efficient to secure the ends of justice, and its proper and prompt administration as is the remedy in equity.' "

Under the view heretofore held by this Court, as expressed in the above quotation, or under any other view, I can not force myself to believe that plaintiff in the present suit has an adequate remedy at law. In the very nature of the business of his profession, as indeed of any other profession, damages can not be known or discovered, much less proved. Plaintiff may know that before the publication of the defamatory matter he owned and enjoyed a large and valuable law business, and that thereafter that business faded away, and that old clients, as well as new, no longer come to his office, or seek his assistance. But can he begin to establish by proof that the

loss of business or of clients resulted from the publication? Though he could do so, what proof can ever be produced, with any degree of accuracy, as to the amount of damages? Can confidence and respect of the public be restored? Can the business be reestablished? If so, how long will it take? To hold that plaintiff, in such circumstances, has an adequate legal remedy which "afforded complete protection against the claims of his adversary" is, in my view, unjustifiable. It may be that in the days of the "Star Chamber" or during the time of "Scroggs", when publication of defamatory statements was necessarily confined to small areas, or probably only among neighbors of the accused, that the determination of such damages could be made with fair accuracy. Those circumstances we can not definitely know, for they are now buried too deep in antiquity. Whatever the facts were out of which the rule contended for by the majority arose, I do not believe that equity should be brought to a dead end by trying to fit such a rule into modern day methods of publication and modern day conditions. Equity should be alive and of continuous growth, not impotent.

Avoidance of multiplicity of actions is another basis of equity jurisdiction for the granting of preventive relief, almost, if not entirely, universally recognized by courts. Considering as having been established, as we must on the demurrer, that the publications of the defamatory, false and malicious statements made by defendant are to be continued indefinitely, for the purpose of destroying plaintiff's professional business, is plaintiff permitted or required to institute an action as to each publication, or as to such publications made over some definite period of time? Let us suppose that he successfully prosecutes an action, collects the judgment obtained, and the publication of the defamatory statements continues. Would he be entitled to prosecute further actions? How many actions would be necessary can not be determined. In such circumstances, I am forced to believe that a multiplicity of actions is certainly probable. In such circumstances, only a court of equity can take command and afford relief in one proceeding.

In my view, the facts in the instant case make it one peculiarly for equity. The facts make it something different from mere libel or slander. In addition to the falsity and maliciousness of the publications, there exists a conspiracy to destroy and an effort to coerce and intimidate. Moreover, such publications are to be continued indefinitely, until plaintiff and his professional business are completely and everlastingly destroyed. In addition, there is the direct charge made against plaintiff by defendant of being a "betrayer of clients". Is it of no concern of a court of equity that the State may require long and expensive preparations to obtain a license to practice a profession and, after licensing an individual, permit the destruction of all that such license may mean, under a theory of adequate remedy for damages? Is the State itself not vitally interested in protecting such licensee from such malicious and unjustifiable attacks? To permit the false and malicious attacks indicated in the record in this case to continue, in my view, invites the lowering of the standard of the legal profession in the eyes of the public to that to which all hope we may never return.

Though argued at some length in defendant's brief, I see herein no involvement of questions relating to freedom of speech. Neither is the provision of the State Constitution, Article III, Section 8, any impediment to equity jurisdiction. That provision merely provides that truth of alleged defamatory publications may be given in evidence, and constitutes truth a good defense in "civil suits" only if "published with good motives, and for justifiable ends". Does not the language necessarily and clearly imply that the publication of false and malicious statements is not protected? Neither has Code, 55-7-2, any application to the facts in this case. That statutory provision merely makes any words "construed as insults and tend to violence and breach of the peace" actionable, and permits a jury to pass thereon. It has nothing to do with protection of property rights, adequate remedy, or multiplicity of actions.

Being of the views indicated, I respectfully dissent. I would affirm the action of the Circuit Court of Mercer

County in refusing to dissolve the temporary injunction and remand the cause for disposition on its merits.